# WOOD ET AL. *v.* GEORGIA

No. 79–6027.   Argued November 4, 1980—Decided March 4, 1981

POWELL, J., delivered the opinion of the Court, in which BURGER, C. J., and BLACKMUN, REHNQUIST, and STEVENS, JJ., joined. STEVENS, J., filed a concurring opinion, *post,* p. 274. BRENNAN, J., filed an opinion concurring in part and dissenting in part, in which MARSHALL, J., joined, *post,* p. 274. STEWART, J., filed an opinion concurring in part and dissenting in part, *post,* p. 275. WHITE, J., filed a dissenting opinion, *post,* p. 275.

*Glenn Zell* argued the cause and filed a brief for petitioners.

*John W. Dunsmore, Jr.,* Assistant Attorney General of Georgia, argued the cause for respondent. With him on the brief were *Arthur K. Bolton,* Attorney General, *Robert S. Stubbs II,* Executive Assistant Attorney General, *Don A. Langham,* First Assistant Attorney General, and *John C. Walden,* Senior Assistant Attorney General.

JUSTICE POWELL delivered the opinion of the Court.

Petitioners in this case are three persons who were convicted of distributing obscene materials and sentenced to periods of probation on the condition that they make regular installment payments toward the satisfaction of substantial fines. Because they failed to make these payments, their probations were revoked by the Georgia court, and they are now claiming that these revocations discriminated against them on the basis of wealth in violation of the Equal Protection Clause of the Fourteenth Amendment. Since the record in this case

suggests that petitioners may be in their present predicament because of the divided loyalties of their counsel, we have concluded that it is inappropriate to reach the merits of this difficult equal protection issue. Instead, we remand this case for further findings concerning a possible due process violation.

I

Petitioners Tante and Allen were working, respectively, as the projectionist and ticket taker at the Plaza Theatre in Atlanta when they were arrested and charged with two counts of distributing obscene materials in violation of Ga. Code § 26–2101 (1978). About four months later, petitioner Wood was arrested and charged with two violations of the same provision after he sold two magazines to a policeman while working at the Plaza Adult Bookstore. There is no evidence that any of these employees owned an interest in the businesses they served or had any managerial responsibilities.

Tante and Allen were tried together and found guilty on both counts by a jury. A separate jury convicted Wood on both counts. All three were then sentenced by the same judge. Tante and Allen each received a fine of $5,000 and two concurrent jail sentences of 12 months, but they were allowed immediate probation. Wood received two $5,000 fines and two consecutive jail sentences of 12 months; he also was placed on probation immediately.

After these convictions were affirmed on appeal,[1] the trial court issued orders specifying the terms of probation. These required all three petitioners to make installment payments on their fines of $500 per month during the course of their periods of probation. After three months had elapsed, none of the petitioners had made any of the required payments, and the county probation officers therefore moved for revoca-

---

[1] *Allen* v. *State*, 144 Ga. App. 233, 240 S. E. 2d 754 (1977), cert. denied, 439 U. S. 899 (1978); *Wood* v. *State*, 144 Ga. App. 236, 240 S. E. 2d 743 (1977), cert. denied, 439 U. S. 899 (1978).

tion of their probations. At a hearing on January 26, 1979, petitioners admitted that they had failed to make the installment payments, but offered convincing evidence of their inability to make these payments out of their own earnings.[2] They also stated that they had expected their employer [3] to pay the fines for them. Faced with petitioners' complete failure to satisfy a condition of their probations, the court decided to revoke these probations unless petitioners made up their arrearages within five days. Unable to do so, petitioners moved for a modification of the conditions of their probations. This motion was denied, and the court ordered petitioners to serve the remaining portions of their jail sentences.

## II

After this revocation decision was affirmed by the Georgia Court of Appeals,[4] we granted a writ of certiorari to decide a question presented by the facts just summarized: whether it is constitutional under the Equal Protection Clause to imprison a probationer solely because of his inability to make installment payments on fines. 446 U. S. 951. On closer inspection, however, the record reveals other facts that make this an inappropriate case in which to decide the constitutional question. Where, as here, a possible due process violation is

---

[2] According to their testimony, all of the petitioners had by that time left their jobs in the "adult" establishments. Allen testified that her only income was $250 per month from unemployment insurance. See Transcript of Revocation Hearing, State Court of Fulton County, Criminal Division (Jan. 26, 1979) (hereinafter Tr.), at 7. Tante testified that his income as a correction officer was $540 per month. *Id.*, at 35. He had been unemployed for eight months before obtaining that job. *Id.*, at 39–40. Wood testified that he was trying to support a family and earning $120 per week working at a truck and trailer rental yard. *Id.*, at 53–54.

[3] The record suggests that the Plaza Theatre, which employed Tante and Allen, and the Plaza Adult Bookstore, which employed Wood, were under common ownership.

[4] 150 Ga. App. 582, 258 S. E. 2d 171 (1979).

apparent on the particular facts of a case, we are empowered to consider the due process issue.[5]   Moreover, for prudential reasons, it is preferable for us to remand for consideration of this issue, rather than decide a novel constitutional question that may be avoided.   Cf. *Spector Motor Service, Inc.* v. *McLaughlin*, 323 U. S. 101, 105 (1944) (broad constitutional

---

[5] JUSTICE WHITE's dissenting opinion argues that this Court lacks jurisdiction to remand this case on due process grounds because, in his view, the conflict-of-interest issue has not been properly presented.   To be sure, it was not raised on appeal below or included as a question in the petition for certiorari.   These facts merely emphasize, however, why it *is* appropriate for us to consider the issue.   The party who argued the appeal and prepared the petition for certiorari was the lawyer on whom the conflict-of-interest charge focused.   It is unlikely that he would concede that he had continued improperly to act as counsel.   And certainly the State's Solicitor, whose duty it was to support the judgment below, could not be expected to do more than call the problem to the attention of the courts, as he did.   Petitioners were low-level employees, and now appear to be indigent.   See n. 2, *supra.*   We cannot assume that they, on their own initiative, were capable of protecting their interests.

As indicated, *post*, at 277-278, n. 1; see also n. 20, *infra*, it is abundantly clear that the possibility of a conflict of interest was pointed out to the trial court at the revocation hearing.   The State's Solicitor raised the issue repeatedly.   The State's Brief in Opposition 4, n. 2, again identified the apparent conflict.   See n. 20, *infra*.   Accordingly, counsel for petitioners cannot be heard to complain of any lack of notice.

In this context, it is appropriate to treat the due process issue as one "raised" below, and proceed to consider it here.   See *Boynton* v. *Virginia*, 364 U. S. 454, 457 (1960) (deciding a case on a statutory issue raised below but not raised in this Court).   Even if one considers that the conflict-of-interest question was not technically raised below, there is ample support for a remand required in the interests of justice.   See 28 U. S. C. § 2106 (authorizing this Court to "require such further proceedings to be had as may be just under the circumstances"); R. Stern & E. Gressman, Supreme Court Practice § 6.27, p. 460 (5th ed. 1978) (in review of state cases, "the Court doubtless limits its power to notice plain error to those situations where it feels the error is so serious as to constitute a fundamental unfairness in the proceedings").   See also *Vachon* v. *New Hampshire*, 414 U. S. 478 (1974).

questions should be avoided where a case may be decided on narrower, statutory grounds on remand).

Petitioners have been represented since the time of their arrests by a single lawyer. The testimony of each petitioner at the probation revocation hearing makes it clear that none of them ever paid—or was expected to pay—the lawyer for his services.[6] They understood that this legal assistance was provided to them by their employer.[7] In fact, the transcript of this hearing reveals that legal representation was only one aspect of the assistance that was promised to petitioners if they should face legal trouble as a result of their employment. They were told that their employer also would pay any fines and post any necessary bonds,[8] and these promises were kept for the most part. In this case itself, as petitioners' lawyer stated at oral argument, bonds were posted with funds he provided.[9] In addition, when each of the petitioners was arrested a second time, he paid the resulting fines.[10] All aspects of this arrangement were revealed to the court at the revocation hearing.

[6] See Tr. 26 (Allen); id., at 43 (Tante); id., at 63 (Wood).

[7] E. g., id., at 42–43 (Tante).

[8] As petitioners' lawyer himself put it: "I want to bring this before the Solicitor and the Court that I believe Mrs. Allen told me and she told the Probation Officer that she—they were told, given information that their fine would be paid. The bond would be paid and a lawyer would be representing them." Id., at 14. See also id., at 62–63 (Wood). During oral argument in this Court, the lawyer conceded that he had been paid by the employer during petitioners' trials. Tr. of Oral Arg. 15–16. He indicated that these payments stopped when petitioners went on probation and left their jobs with this employer, but he has never dispelled the implication that he has an ongoing employment arrangement with the employer.

[9] Id., at 8. The fact that the employer provided appeal bonds for petitioners after the probation revocation hearing suggests that his involvement with the case did not end when petitioners quit work in these "adult" establishments.

[10] Tr. 12, 41, 56–57. These payments took place while the instant cases were still on direct appeal.

For some reason, however, the employer declined to provide money to pay the fines in the cases presently under review.[11] Since it was this decision by the employer that placed petitioners in their present predicament, and since their counsel has acted as the agent of the employer and has been paid by the employer, the risk of conflict of interest in this situation is evident. The fact that the employer chose to refuse payment of these fines, even as it [12] paid other fines and paid the sums necessary to keep petitioners free on bond in this case, suggests the possibility that it was seeking—in its own interest—a resolution of the equal protection claim raised here. If offenders cannot be jailed for failure to pay fines that are beyond their own means, then this operator of "adult" establishments may escape the burden of paying the fines imposed on its employees when they are arrested for conducting its business. To obtain such a ruling, however, it was necessary for petitioners to receive fines that were beyond their own means and then risk jail by failing to pay.

Although we cannot be sure that the employer and petitioners' attorney were seeking to create a test case, there is a clear possibility of conflict of interest on these facts. Indications of this apparent conflict of interest may be found at various stages of the proceedings below. It was conceded at oral argument here that petitioners raised no protest about the

---

[11] Counsel suggested at oral argument that the reason for this decision not to pay the fines was a change of ownership. It might also be explained by the fact that petitioners were no longer working for the "adult" establishments. Neither of these facts suggests, however, that the employer had lost interest in the case, since appeal bonds were provided for petitioners. Indeed, the providing of these appeal bonds suggests that the decision not to pay the fines themselves was a conscious one. And the fact that petitioners had left their jobs may have allowed the employer to pursue his goals without any concern about losing petitioners' services in the event of a probation revocation.

[12] The record does not make clear whether the employer was an individual or a corporation, or indeed even identify the employer.

size of the fines imposed at the time of sentencing. During the three months leading up to the probation revocation hearing they failed to pay even small amounts toward their fines to indicate their good faith. In fact, throughout this period, petitioners apparently remained under the impression that—as promised—the fines would be paid by the employer. Even at the revocation hearing itself, petitioners attempted to prove their inability to make the required payments but failed to make a motion for a modification of those requirements. That motion was not made until one day before petitioners were due to be incarcerated.[13] A review of these facts demonstrates that, if petitioners' counsel was serving the employer's interest in setting a precedent, this conflict in goals may well have influenced the decision of the trial court to impose such large fines, as well as the decision to revoke petitioners' probations rather than to modify the conditions.[14]

## III

Courts and commentators have recognized the inherent dangers that arise when a criminal defendant is represented by a

---

[13] Petitioners' counsel states that he did attempt to alert the court to the problem of petitioners' inability to pay by letter, soon after their probations began. But no motion was made.

[14] There is also a danger that petitioners' lawyer was influenced in his strategic decisions by other improper considerations. Rather than relying solely on the equal protection claims, he could have sought leniency at the probation hearing by arguing that the stiff sentences imposed on petitioners should be modified in light of the employer's unanticipated refusal to pay the fines. But this would have required him to dwell on the apparent bad faith of his own employer, and to emphasize the possibly improper arrangement by which he came to represent petitioners. Thus it is not correct, as JUSTICE WHITE argues, *post,* at 281, that the "conflict of interests . . . only emerges by assuming that the employer . . . set out to construct a constitutional test case." Even if the employer's motives were unrelated to its interest in establishing a precedent, its refusal to pay the fines put the attorney in a position of conflicting obligations.

lawyer hired and paid by a third party, particularly when the third party is the operator of the alleged criminal enterprise.[15] One risk is that the lawyer will prevent his client from obtaining leniency by preventing the client from offering testimony against his former employer or from taking other actions contrary to the employer's interest.[16] Another kind of risk is

---

[15] As one court has stated:

"A conflict of interest inheres in every such situation. . . . It is inherently wrong to represent both the employer and the employee if the employee's interest may, and the public interest will, be advanced by the employee's disclosure of his employer's criminal conduct. For the same reasons, it is also inherently wrong for an attorney who represents only the employee to accept a promise to pay from one whose criminal liability may turn on the employee's testimony." *In re Abrams,* 56 N. J. 271, 276, 266 A. 2d 275, 278 (1970).

See also *In re Investigation Before April 1975 Grand Jury,* 174 U. S. App. D. C. 268, 274, n. 11, 531 F. 2d 600, 606, n. 11 (1976); *Pirillo* v. *Takiff,* 462 Pa. 511, 341 A. 2d 896 (1975), appeal dism'd and cert. denied, 423 U. S. 1083 (1976); ABA Model Code of Professional Responsibility DR 5-107 (A), (B) (1980); ABA Standards for Criminal Justice 4-3.5 (c) (2d ed. 1980); Lowenthal, Joint Representation in Criminal Cases: A Critical Appraisal, 64 Va. L. Rev. 939, 960-961 (1978).

[16] There are indications in the transcript of the revocation hearing that the State had been unable to learn the name of petitioners' employer, and that petitioners were concealing its identity. At one point, the Solicitor stated: "Mrs. Allen, is it not true each time you were arrested that we sought to get your cooperation to find out who is operating these places?" Tr. 28. Later, during the Solicitor's cross-examination of Tante, the following colloquy took place:

"Q Mr. Tante, who did you call when you said you called and told them to get someone else out there?

"A I called the secretary of the union first.

"Q And what about the company? Did you call them?

"A And the company, I gave notice to—whatever his name was. Mister—what was his name?

"MR. ZELL [petitioners' attorney] I'm sorry, I wasn't listening.

"A The manager of the theatre, Mister—I think it was you I told first. I said, 'I want to get out of the theatre as soon as possible. In fact, I'd

present where, as here, the party paying the fees may have had a long-range interest in establishing a legal precedent and could do so only if the interests of the defendants themselves were sacrificed.[17]  As suggested above, the factual setting of this case requires the Court to take note of the potential unfairness resulting from this particular third-party fee arrangement.  Petitioners were mere employees, performing the most routine duties, yet they received heavy fines on the apparent assumption that their employer would pay them. They now face prison terms solely because of the employer's failure to pay the fines, having been represented throughout

---

like to leave now.' And I said, 'As far as I'm concerned, I'm out, and that's it.'

"Q  You called Mr. Zell to tell him to get someone else out there to operate the theatre?

"A  No, sir.  I called my business secretary at the union, told them I wanted out; to find me another job.  If they wanted to put a man in there send them out.  And they informed me to get on out of there that they would not send another union man out there.

"Q  But you also talked to someone with the company, you said?

"A  At the time, I did not, sir.  I told Mister—Mrs. Allen, I said—

"MR. ZELL  Hold it.  Hold it, Mr. Tante.  It's now ten-thirty, Your Honor.  We're getting into areas that—the only question here is violation or failure to pay as directed."  *Id.*, at 45–46.

[17] The ABA Model Code of Professional Responsibility EC 5-23 (1980) states:

"A person or organization that pays or furnishes lawyers to represent others possesses a potential power to exert strong pressures against the independent judgment of those lawyers.  Some employers may be interested in furthering their own economic, political, or social goals without regard to the professional responsibility of the lawyer to his individual client. *Others may be far more concerned with establishment or extension of legal principles than in the immediate protection of the rights of the lawyer's individual client.* . . .  Since a lawyer must always be free to exercise his professional judgment without regard to the interests or motives of a third person, the lawyer who is employed by one to represent another must constantly guard against erosion of his professional freedom." (Emphasis added.)

by a lawyer hired by that employer. The potential for injustice in this situation is sufficiently serious to require us to consider whether petitioners have been deprived of federal rights under the Due Process Clause of the Fourteenth Amendment.

We have held that due process protections apply to parole and probation revocations. *Gagnon* v. *Scarpelli*, 411 U. S. 778 (1973); *Morrissey* v. *Brewer*, 408 U. S. 471 (1972). In *Scarpelli* we adopted a standard for deciding when due process requires appointment of counsel for indigent offenders during revocation hearings. Recognizing that the "need for counsel at revocation hearings derives, not from the invariable attributes of those hearings, but rather from the peculiarities of particular cases," 411 U. S., at 789, we left it to the state tribunals to identify, on a case-by-case basis, the situations in which fundamental fairness requires appointed counsel.

In the present case, petitioners appeared at the hearing with retained counsel, as was their right under Ga. Code § 27–2713 (1978). But, significantly, petitioners would have had a right to appointed counsel if they had made the showing of indigence on which they now rely. *Scarpelli* established a presumption in favor of appointment of counsel in cases where the probation or parole violation is a matter of record but "there are substantial reasons which justified or mitigated the violation and make revocation inappropriate, and . . . the reasons are complex or otherwise difficult to develop or present." 411 U. S., at 790. This case, where there were assurances that the fines would be paid by an unnamed employer, falls into that category.

Where a constitutional right to counsel exists, our Sixth Amendment cases hold that there is a correlative right to representation that is free from conflicts of interest. *E. g., Cuyler* v. *Sullivan*, 446 U. S. 335 (1980); *Holloway* v. *Arkansas*, 435 U. S. 475, 481 (1978). Here, petitioners were represented by their employer's lawyer, who may not have pursued

their interests single-mindedly. It was his duty originally at sentencing and later at the revocation hearing, to seek to convince the court to be lenient. On the record before us, we cannot be sure whether counsel was influenced in his basic strategic decisions by the interests of the employer who hired him. If this was the case, the due process rights of petitioners were not respected at the revocation hearing, or at earlier stages of the proceedings below.

It is, however, difficult for this Court to determine whether an actual conflict of interest was present, especially without the benefit of briefing and argument on this issue. Nevertheless, the record does demonstrate that the *possibility* of a conflict of interest was sufficiently apparent at the time of the revocation hearing to impose upon the court a duty to inquire further.[18] The facts outlined above were all made known at that time. The court must have known that it had imposed disproportionately large fines—penalties that almost certainly were increased because of an assumption that the employer would pay the fines.[19] The court did know that petitioners' counsel had been provided by that employer and was pressing a constitutional attack rather than making the arguments for leniency that might well have resulted in substantial reductions in, or deferrals of, the fines. These facts demonstrate convincingly the duty of the court to recognize the possibility of a disqualifying conflict of interest. Any doubt as to whether the court should have been aware of the problem is dispelled

[18] JUSTICE WHITE's dissent states that we have gone beyond the recent decision in *Cuyler* v. *Sullivan*, 446 U. S. 335 (1980). Yet nothing in that case rules out the raising of a conflict-of-interest problem that is apparent in the record. Moreover, *Sullivan mandates* a reversal when the trial court has failed to make an inquiry even though it "knows or reasonably should know that a particular conflict exists." *Id.*, at 347.

[19] Both counsel agreed that, in light of the size of the fines imposed on petitioners—relatively minor and impecunious participants in the criminal enterprises—the judge must have assumed that the employer would pay. Tr. of Oral Arg. 13, 40.

by the fact that the State raised the conflict problem explicitly and requested that the court look into it.[20]

For these reasons, we base our decision in this case on due process grounds. The judgment below is vacated and the case remanded with instructions that it be returned to the State Court of Fulton County. That court should hold a hearing to determine whether the conflict of interest that this record strongly suggests actually existed at the time of the probation revocation or earlier. If the court finds that an actual conflict of interest existed at that time, and that there

---

[20] At one point during the discussion of Allen's case, the Solicitor, Mr. Rhodes, put it this way:

"MR. RHODES: What I'm trying to show is, Your Honor, that she in fact—that Mr. Zell [the attorney] was·hired by someone else. She did not make the choice. That they sent Mr. Zell down here to represent her. And she may have acquiesced in it, but that she did not employ Mr. Zell to represent her.

"THE COURT: All right. How is that relevant to this issue?

"MR. RHODES: To what I say, *there's a conflict of interest in this case.*

"Mr. Zell is representing her employer, and there's two different interests there.

"They had promised this woman that they would pay her fine and they would take care of all these expenses. *There's a conflict.*

"Mr. Zell's, as I said, his first duty is to the persons that pay him. And that's what he's doing. He's trying to take care of them." Tr. 26–27 (emphasis added).

See also *id.*, at 14–15.

As noted in n. 5, *supra,* the State raised this problem here as an argument against a grant of certiorari. The State's Brief in Opposition 4, n. 2, stated:

"During the probation revocation hearing there were several discussions between the Court, the Petitioner's [sic] lawyer and the Solicitor concerning the fact that the Petitioner's [sic] lawyer also represents the Plaza Theater, the theater in which Petitioners Allen and Tante were employed. The argument of the Solicitor was that the employer had agreed to pay the fines, and now was attempting to get out of paying the fines by arguing that there was no agreement, and that Petitioners were now indigents . . . ."

was no valid waiver of the right to independent counsel, it must hold a new revocation hearing that is untainted by a legal representative serving conflicting interests.[21]

*Vacated and remanded.*

JUSTICE STEVENS, concurring.

Although I join the Court's opinion, my view that the potential conflict of interest disclosed by the record requires that the judgment be vacated does not rest on the hypothesis that the petitioners' employer may have contrived a test case. See *ante,* at 267–268, 269–270. It rests instead on the likelihood that the state trial court would have imposed a significantly different sentence if it had not been led to believe that the employer would pay the fines.

Independent counsel for these individuals surely would not have permitted the trial judge to impose fines that were manifestly beyond their ability to pay without obtaining an enforceable commitment from the employer. But a lawyer faithfully representing the interest of the employer surely would not make any such commitment gratuitously. The net result of the conflicting interests represented by one lawyer is a manifestly unfair prison sentence imposed on employees of the person who is probably the principal wrongdoer.

JUSTICE BRENNAN, with whom JUSTICE MARSHALL joins, concurring in part and dissenting in part.

While I agree with the Court that "there is a clear possibility of conflict of interest" shown on this record, *ante,* at 267,

---

[21] Because we are presented here only with the question of petitioners' probation revocations, we do not order more sweeping relief, such as vacating petitioners' sentences or reversing their convictions. Such actions do, however, remain within the discretion of the trial court upon appropriate motion.

There also is the possibility that this relief may be available in habeas corpus proceedings, if petitioners can show an actual conflict of interest during the trials or at the time of sentencing.

and that the Court has the option to remand on this issue, I would nevertheless finally dispose of this case. That can be done, as JUSTICE WHITE concludes, by reversing the judgment of the Georgia Court of Appeals, for the reason that *Tate* v. *Short,* 401 U. S. 395 (1971), compels that conclusion. I would, however, reverse the conviction for distributing obscene materials in violation of Ga. Code § 26–2101 (1978) under the view I have frequently expressed, and to which I adhere, that such an obscenity statute is facially unconstitutional. See *Paris Adult Theatre I* v. *Slaton,* 413 U. S. 49, 73, 113 (1973) (BRENNAN, J., dissenting); *McKinney* v. *Alabama,* 424 U. S. 669, 678 (1976) (separate opinion of BRENNAN, J.).

JUSTICE STEWART, concurring in part and dissenting in part.

In my view the Court is correct in remanding because of the "clear possibility of conflict of interest" shown on the record in this case. I would, however, go further and reverse the convictions themselves, which were for violations of an obscenity statute. I believe that that statute, Ga. Code § 26–2101 (1978), is facially unconstitutional.

JUSTICE WHITE, dissenting.

The Court's disposition of this case is twice flawed: first, there is no jurisdiction to vacate the judgment on the federal constitutional ground upon which the Court rests; second, the record does not sustain the factual inferences required to support the Court's judgment.

I

The petition for certiorari presented a single federal question: Does the Equal Protection Clause of the Fourteenth Amendment permit a State to revoke an indigent's probation because he has failed to make regular payments toward the satisfaction of a fine? This issue was properly presented to and ruled upon by the Georgia courts. No other federal con-

stitutional issue was presented there or brought here. The Court, however, disposes of this case on another ground, but a ground that also involves a constitutional issue: the possibly divided loyalties of petitioners' counsel may have deprived petitioners of due process and their constitutional right to counsel. Thus, we are to avoid one constitutional issue in favor of another, which was not raised by petitioners either here or below. I do not believe that this Court has jurisdiction even to reach this question, nor do I see why we should prefer one constitutional issue to another, even if we had the jurisdiction.

The Court, *ante,* at 273, n. 20, suggests that the conflict-of-interest issue was presented here by respondent, the State of Georgia. But the State merely argued that petitioners' attorney was also the attorney for petitioners' employer who had agreed to pay the fine and who was now seeking to avoid payment by arguing petitioners' indigency. Neither here nor in the trial court has the State ever suggested that petitioners were deprived of due process or raised any other federal constitutional issue. The State has surely not confessed error or given any other indication that it is seeking anything but an affirmance of the decision below—hardly an appropriate disposition if the State is suggesting that petitioners were denied their constitutional right to counsel. Moreover, nowhere in the passage of the response cited by the Court are the terms "conflict of interest" used, nor is there even a clear suggestion made that counsel was acting other than in the interests of petitioners in arguing that an indigent's probation cannot be revoked for failure to pay a fine.

However the State's argument here is to be characterized, this case comes to us on writ of certiorari to a state court. Our jurisdiction, therefore, arises under 28 U. S. C. § 1257 (3) and is limited here to federal rights and privileges that have been "specially set up or claimed," and upon which there has been a final decision by the highest state court in which a

decision could be had. The right-to-counsel claim was never raised in the state court, nor did the state court ever render a decision on the issue: There is, thus, a jurisdictional bar to our reaching the issue. *Moore* v. *Illinois,* 408 U. S. 786, 799 (1972); *Hill* v. *California,* 401 U. S. 797, 805 (1971); *Cardinale* v. *Louisiana,* 394 U. S. 437 (1969), and cases cited there.

It is as clear as could be that no federal constitutional claim of any kind was made in the state courts with respect to a conflict of interest and the adequacy of petitioners' counsel. At the revocation hearing, petitioners testified that they were without funds to pay the fines, and their counsel urged that to incarcerate them would violate the Equal Protection Clause of the Fourteenth Amendment. On cross-examination, petitioners indicated that they had been assured by their employer that the employer would pay employee fines if they were convicted in cases such as this. The State's attorney then asserted several times that there was a conflict of interest because petitioners' counsel also represented petitioners' corporate employer and was being paid by that concern to represent petitioners.[1] But far from suggesting that the

---

[1] The following colloquy, similar to others, took place at one point in the revocation hearing:

"MR. RHODES: Your Honor, I submit that actually what we have here is a conflict of interest on Mr. Zell's part. He's representing the company and he's trying to get out of paying this money that these people expect that company to pay that money. Mr. Zell is here purporting to represent her while he legally represents a company that has promised to pay all these expenses and fines for these people. And I would ask the Court to look into that and make a determination of that, and if necessary, see that these people have Counsel to enforce that agreement between that company and these people.

"THE COURT: State that again now.

"MR. RHODES: Mr. Zell is here representing Mrs. Allen. Now, Mrs. Allen contends that that company promised to pay all this so that she wouldn't have to go through all of this.

"Now they have not done it.

alleged conflict was a ground of relief for petitioners, the State suggested that petitioners and their counsel had misled the court into thinking that the employer would pay the fines, and that the employer's undertaking should be enforced by sending petitioners "out to the jail for a while," [2] rather than permit the employer to renege and free petitioners on equal protection grounds. This would convince the employer to pay because it would not want other employees to know that they would not be taken care of in the event trouble arose.[3]

"And I submit that Mr. Zell represents that company. That he is, his first allegiance is to that company, and not to Mrs. Allen.

"And that there's a conflict of interest, and that this ought to be looked into by this Court.

"THE COURT: You wish to respond?

"MR. ZELL: I don't think it makes any sense what he's saying but I will if the Court wants me to. I don't think I'm required to.

"THE COURT: I don't know whether there's anything the Court could look into. What specifically do you want the Court to look into?

"MR. RHODES: Mr. Zell is here supposedly representing Mrs. Allen. He at the same time represents the people who promised to take care of these things and to pay these fines.

"Now those people are not doing it. And they apparently have reneged on it at this point. I think if you sent these people out to the jail for a while I think they would pay it because they don't want the other employees to know that they are not taking care of these things when they come up." Transcript of Revocation Hearing (Tr.) 14–15. The transcript is an appendix to the response of respondent.

Other discussions appear in *id.*, at 25–28.

[2] *Id.*, at 15.

[3] The State's position in this regard is clear from its response to the petition for certiorari:

"In fact, Respondent believes that the Petitioners have no intention whatsoever in paying these fines, as their testimony indicates that they are of the opinion that their employers should have paid these fines. The Petitioners are thus holding the enforcement of fines as a recognized sentencing tool a hostage because of their beliefs that others should pay their fines for them. By arguing at this time that they are indigent they are using this as a shield to hide behind their responsibility to pay a fine, which they earlier agreed to pay by virtue of their silence which led the

In the course of these arguments, the State never mentioned the Federal Constitution.

Petitioners' attorney in turn responded that although there had been an advance arrangement between petitioners and their employer that fines would be paid by the latter, the employer had not paid, and the only issue was whether petitioners should go to jail when they were without funds themselves to pay the fines. He urged that jailing them would violate the Equal Protection Clause.[4] He also suggested that if the asserted conflict of interest raised an ethical problem in the mind of the State's attorney, a complaint should be filed with the State Bar.[5]

The judge, apparently rejecting the equal protection claim, revoked petitioners' probation, although petitioners have remained free on bond pending appeal. The sole issue in the Georgia Court of Appeals was whether petitioners had been denied the equal protection of the laws. That claim was rejected, the judgment of revocation was affirmed, and the Georgia Supreme Court denied further review. The equal protection issue, as I have said, is the only federal constitutional issue that has been presented here.

The Court asserts that "it is appropriate to treat the due process issue as one 'raised' below, and proceed to consider it here." *Ante,* at 265, n. 5. However, the Court fails to cite any passage from the record in which the alleged conflict of interest was presented to the state courts as a problem of constitutional dimension. The Court relies on 28 U. S. C. § 2106,

sentencing court to conclude that they were able to pay these fines." Brief in Opposition 10.

Elsewhere, the State suggested "that they be put out there in jail and start serving . . . that's the only way really I know, to enforce this sentence at this point." Tr. 74.

[4] *Id.,* at 16–20.

[5] *Id.,* at 27: "I would suggest Mr. Rhodes report this to the State Bar of Georgia and be glad at a hearing to testify if there is any impropriety and submit to any questions before the State Bar."

but that section does not purport to expand the statutory limits on the Court's jurisdiction; rather, it relates only to the disposition of the case once jurisdiction exists. What JUSTICE REHNQUIST wrote in *Vachon* v. *New Hampshire,* 414 U. S. 478, 482 (1974) (dissenting opinion), is equally applicable here:

> "A litigant seeking to preserve a constitutional claim for review in this Court must not only make clear to the lower courts the nature of his claim, but he must also make it clear that the claim is constitutionally grounded. *Bailey* v. *Anderson,* 326 U. S. 203 (1945)."

Petitioners have done neither; nor has respondent done it for them.

The Court apparently believes that under *Cuyler* v. *Sullivan,* 446 U. S. 335 (1980), the possibility of a conflict of interest of constitutional dimensions should have prompted further inquiry by the trial judge. But *Cuyler* v. *Sullivan* did not purport to give this Court jurisdiction over a claim otherwise beyond its reach. *Cuyler* held only that if a trial court "reasonably should know that a particular conflict exists," *id.,* at 347, then a failure to initiate an inquiry may constitute a Sixth Amendment violation. If this is the case here, then petitioners remain free to seek collateral relief in the lower courts.[6]

---

[6] This Court's Rule 34.1 (a), the plain-error rule, does not purport to authorize the Court to vacate state-court judgments on the ground of a "possible" due process or other constitutional violation which the Court, *sua sponte,* has discovered in the record but which was neither raised nor decided in the state courts. Where an issue has been properly raised and decided in state litigation but not raised here, Rule 34.1 (a) would permit us to reach that issue though not presented by the parties. Cf. *Boynton* v. *Virginia,* 364 U. S. 454, 457 (1960).

In *Vachon* v. *New Hampshire,* 414 U. S. 478 (1974), the Court relied on our "plain error" rule to reach an issue not presented in the jurisdictional statement. However, appellant there had unsuccessfully argued the issue—sufficiency of the evidence—below and the issue had been addressed

A majority of the Court, however, proceeds on the basis that it has jurisdiction to address the due process/adequacy-of-counsel issue.  Accordingly, I proceed on that assumption.

## II

As I see it, the Court's disposition of the case rests upon critical factual assumptions that are not supported by the record.  Certainly the mere fact that petitioners' counsel was paid by their employer does not in itself constitute a conflict of interest of constitutional dimension.[7]  Indeed, one would expect that in the normal course of things the interests of petitioners and of their employer would have corresponded throughout the proceedings.  It would have been just as much in the employer's as in the employees' interest to have had the employees adjudged innocent.  Similarly, assuming that the employer had promised to pay whatever fines might be levied against the employees, it was in the employer's interest, just as it was in their interest, to have these fines set at the lowest possible amount.  The conflict of interests, therefore, only emerges by assuming that the employer, the owner of an adult bookstore and a movie theater, set out to construct a constitutional test case and the petitioners' counsel represented the employer in this regard.  Not even a decision to pursue a test case, however, would in itself create a conflict of interest.  One must assume further that it was for the sake of this interest that the employer decided not to pay the fines and for the sake of this interest of the employer

by the State Supreme Court.  The dissent in *Vachon* did not contend that appellant had failed to raise the issue below; rather, it argued that although raised, the issue had not been presented to the state courts as a "federal constitutional claim."  The majority, evidently, thought that it had.

[7] Although petitioners' counsel admitted at oral argument that he had been paid by petitioners' employer at the time of trial, he indicated that the payments from the employer ended at the time petitioners were put on probation.  Tr. 13–16.

that petitioners' attorney did not object to the size of the fines or move in timely fashion for a modification of the conditions of probation.

I recognize that the Court's conclusion relies only upon the "possibility" of this scenario, but I find these assumptions implausible and would require a much stronger showing than this record reveals before I would speculate on the likelihood of such a motive of the employer and the knowing cooperation of counsel to this end, let alone dispose of the case on that basis.[8]   First, since the only submission of petitioners was that they should not go to jail for failure to pay their fines, even if the court sustained their position, their liability on the fine would remain—as would that of the employer if it had an enforceable obligation to pay.   It is, therefore, difficult to find any interest that the employer might have in litigating a test case on this issue through the Georgia courts and to this Court.   Second, the record suggests two much more plausible explanations of the employer's failure to pay the fines, neither of which implies a conflict of interest: The employer may have reneged on its promise to pay fines because petitioners were no longer working for the employer, or it may have reneged because ownership of the establishments changed

---

[8] Petitioners' attorney also said: "I want the court to know, and Mr. Rhodes to know that I've attempted at least was asked, to get the fines paid.   And of course, you can see the result of it.

"I told the three defendants I would represent them to the best of my ability, and I've explained this to the defendants, and I would like to make an explanation to the court."   *Id.*, at 68.

Interesting also is the following exhange from the cross-examination of one of the petitioners:

"Q   Did you select Mr. Zell as your attorney?

"A   Yes, sir.   I've known him a long time and I trust him.   And he's the only lawyer I've ever had to have in my life, and yes, sir, I selected him."   *Id.*, at 42.

As far as this record reveals, none of the petitioners to this date has complained about the legal representation.

hands.[9] The fact that the employer may have continued to meet some of the expenses, but did not pay the substantial fines, does not indicate to me that the employer manipulated the situation to create a test case; more likely, the employer reneged on his promise because, given the change in circumstances of both the employer and the petitioners, the expense was simply greater than that which the employer was willing to bear at this point.

If the employer was simply unwilling to pay the fines, then the arguments advanced by the attorney may very well have been the best and only arguments available to petitioners.[10] Indeed, the employer having failed to pay, counsel would have been derelict not to press the equal protection claim on behalf of his indigent clients. Obviously, success on this ground would have advantaged petitioners; and I fail to see, as apparently the trial court failed to see, Tr. 15, 28, how petitioners will be constitutionally deprived by assertion of the equal protection claim. The fact that petitioners did move, although belatedly, for a modification of the conditions of parole[11] further indicates that the employer was more in-

---

[9] There is no indication in the record that the employer owned other adult establishments. If, as counsel suggested at oral argument, ownership has in fact changed hands, then it seems unlikely that the ex-employer would continue to be interested in creating and litigating a test case in a matter with which he is no longer concerned.

[10] I note that petitioners argue in their response that the trial court was fully aware of their financial situation. Response for Petitioners 2. This is amply supported by the record. The Court, therefore, creates an artificial issue when it argues that counsel's conflicting loyalties may have prevented him from arguing for leniency in light of the employer's failure to pay the fines. The point was made repeatedly that these petitioners were indigent and could not themselves pay. Petitioners' attorney conceded that a defendant who has been fined and who himself could pay the fine could not hide behind the promise of another that the latter would pay. Tr. 69.

[11] The fact that this motion was made and rejected indicates that a remand to the trial court to reconsider this issue is not likely to lead to a different result. It also suggests that the inadequacy of counsel sug-

terested in cutting his costs than creating a test case.[12]   On this record, therefore, I believe it necessary to reach the substantive question that we granted certiorari to resolve.

### III

Although I think that there are circumstances in which a State may impose a suitable jail term in lieu of a fine when the defendant cannot or will not pay the fine, there are constitutional limits on those circumstances, and the State of Georgia has exceeded the limits in this case.

In *Williams* v. *Illinois,* 399 U. S. 235 (1970), Williams, convicted of petty theft, received the maximum sentence of one year's imprisonment and a $500 fine (plus $5 in court costs). As permitted by Illinois statute, the judgment provided that if, when the one-year sentence expired, Williams did not immediately pay the fine and court costs, he was to remain in jail a length of time sufficient to satisfy the total debt, calculated at the rate of $5 per day.   We held that "the Equal Protection Clause of the Fourteenth Amendment requires that the statutory ceiling placed on imprisonment for any substantive offense be the same for all defendants irrespective of their economic status." *Id.,* at 244.   Therefore, the Illinois statute as applied to Williams, who was too poor to pay the fine, violated the Equal Protection Clause.

*Tate* v. *Short,* 401 U. S. 395 (1971), involved an indigent defendant incarcerated for nonpayment of fines imposed for

gested by the Court amounts to nothing more than his late filing of this motion, not a failure to ask for leniency.

[12] Even this statement asserts more than the evidence of record supports: other than the assertions of the State's attorney in a colloquy with the judge at the revocation hearing, there is no suggestion in this record that the employer directed this litigation in any way.   The fact that counsel was paid for some period by the employer does not support an inference that counsel was representing the interests of the employer rather than those of petitioners.   See ABA Model Code of Professional Responsibility, DR 5-107 (B) (1980).

violating traffic ordinances. Under Texas law, traffic offenses were punishable only by fines, not imprisonment. When Tate could not pay $425 in fines imposed for nine traffic convictions, he was jailed pursuant to the provisions of another Texas statute and a municipal ordinance that required him to remain in jail a sufficient time to satisfy the fines, again calculated at the rate of $5 per day. We reversed on the authority of *Williams* v. *Illinois,* saying: "Since Texas has legislated a 'fines only' policy for traffic offenses, that statutory ceiling cannot, consistently with the Equal Protection Clause, limit the punishment to payment of the fine if one is able to pay it, yet convert the fine into a prison term for an indigent defendant without the means to pay his fine." 401 U. S., at 399. The Court, however, was careful to repeat what it had said in *Williams:* " 'The state is not powerless to enforce judgments against those financially unable to pay a fine' " and is free to choose other means to effectuate this end. 401 U. S., at 399.

In *Williams* v. *Illinois, supra,* at 243, the Court emphasized that its holding "does not deal with a judgment of confinement for nonpayment of a fine in the familiar pattern of alternative sentence of $30 or 30 days." In neither *Williams* nor *Tate* did it appear that "jail [was] a rational and necessary trade-off to punish the individual who possesses no accumulated assets . . . since the substitute sentence provision, phrased in terms of a judgment collection statute, [did] not impose a discretionary jail term as an alternative sentence, but rather equate[d] days in jail with a fixed sum." *Williams* v. *Illinois, supra,* at 265 (Harlan, J., concurring in result). As both the Court and Justice Harlan implied, if the Court had confronted a legislative scheme that imposed alternative sentences, the analysis would have been different.

Indigency does not insulate those who have violated the criminal law from any punishment whatsoever. As I see it, if an indigent cannot pay a fine, even in installments, the

Equal Protection Clause does not bar the State from specifying other punishment, even a jail term, in lieu of the fine.[13]    To comply with the Equal Protection Clause, however, the State must make clear that the specified jail term in such circumstances is essentially a substitute for the fine and serves the same purpose of enforcing the particular statute that the defendant violated.    In both *Williams* and *Tate* the State violated this principle by speaking inconsistently: In each case, the legislature declared its interest in penalizing a particular offense to be satisfied by a specified jail term (in *Tate,* no jail term at all) and at the same time subjected the indigent offender to a greater term of punishment.

The incarceration of the petitioners in this case cannot be distinguished from that which we found to be unconstitutional in *Williams* and *Tate*.    Here, the State imposed probated prison terms and fines, but made installment payment of the fines a condition of probation: Had the fines been paid in full and other conditions of probation satisfied, there would have been no time in jail at all.    Thus, the ends of the State's criminal justice system did not call for any loss of liberty except that incident to probation.

Under these circumstances, the State's only interest in incarcerating these petitioners for not paying their fines was to impose a loss of liberty that would be as efficacious as the fines in satisfying the State's interests in enforcing the criminal law involved.    However, no calculation like that was made here.    Upon nonpayment, probation was automatically revoked and petitioners were sentenced to their full prison

---

[13] In imposing an alternative sentence the State focuses on the penalty appropriate for the particular offense and structures two punishments, each tailored to meet the State's ends in responding to the offense committed.    Such tailoring may consider the financial situation of the defendant, *Williams* v. *New York,* 337 U. S. 241, 246–250 (1949), but it does so only in the context of structuring a penalty appropriate to the offense committed.

terms.[14]    There was no attempt to provide, in addition to the jail terms for which they were given probation, a term of imprisonment that would be a proper substitute for the fines. In fact, even at the conclusion of their prison terms, petitioners will apparently be liable for the unpaid fines.    This is little more than imprisonment for failure to pay a fine, without regard to the goals of the criminal justice system.    As in *Williams* and *Tate,* the State is speaking inconsistently concerning the necessity of imprisonment to meet its penal objectives; imprisonment of an indigent under these circumstances is constitutionally impermissible.

This case falls well within the limits of what we meant to prohibit when we announced in *Tate* v. *Short, supra,* at 398, quoting *Morris* v. *Schoonfield,* 399 U. S. 508, 509 (1970), that the " 'Constitution prohibits the State from imposing a fine as a sentence and then automatically converting it into a jail term solely because the defendant is indigent.' "

Accordingly, I would reverse the judgment.

---

[14] As the majority opinion makes clear, the fines were quite heavy, perhaps in anticipation of payment by the employer.    There was no expectation that these defendants, if they performed well on probation, would serve any time in jail, let alone a long term.