Filed 7/31/14  P. v. Her CA5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

**IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA**

**FIFTH APPELLATE DISTRICT**

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | F064657 |
| v. | (Super. Ct. No. F10906506) |
| MING CHIA HER, | **OPINION** |
| Defendant and Appellant. | |

**THE COURT**\*

APPEAL from a judgment of the Superior Court of Fresno County.  Hilary A. Chittick, Judge.

Conness A. Thompson, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Christina Hitomi Simpson, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

---

\*       Before Levy, Acting P.J., Cornell, J. and Detjen, J.

After contraband was discovered in his home during a probation search, defendant Ming Chia Her was convicted by jury trial of possession of marijuana for sale (Health & Saf. Code, § 11359; count 1) and possession of ammunition by a person prohibited from possessing a firearm (former Pen. Code, § 12316, subd. (b)(1); count 2).[1] The trial court sentenced defendant to four years in prison. On appeal, defendant contends the trial court failed to perform its duty under *Wood v. Georgia* (1981) 450 U.S. 261 to investigate the possibility that defense counsel had a conflict of interest based on his previous representation of a potential defense witness. We affirm.

## FACTS

On December 25, 2010, Officer Dorian and other officers went to defendant's house to conduct a lawful search. Defendant and his four children, all under 16 years of age, were present in the house. In a kitchen cabinet, Officer Dorian found two clear plastic trash bags of marijuana, knotted at the top and weighing slightly over one pound each. She also found a bag of marijuana weighing 3.6 ounces. In a kitchen drawer, Officer Dorian found a box of .45 caliber ammunition, as well as car keys. Six of the bullets were missing from the ammunition box. In another kitchen cabinet, Officer Dorian found heat-sealed plastic bags of marijuana, a heat-sealing device, and scales. Two of the bags were marked "GDP" and another was marked "PH." The "GDP" bags weighed approximately one pound each. On a kitchen counter, Officer Dorian found documents with notations, including names, numbers, and quantities. In addition, she found a hollowed-out soft drink can.

The officers searched a bedroom that appeared to be a storage room. In the closet, they found two large athletic bags. In the red bag were seven plastic trash bags of

---

[1]     All statutory references are to the Penal Code unless otherwise noted.

Former section 12316, subdivision (b)(1) provided: "No person prohibited from owning or possessing a firearm under Section 12021 or 12021.1 of this code or Section 8100 or 8103 of the Welfare and Institutions Code shall own, possess, or have under his or her custody or control, any ammunition or reloaded ammunition."

marijuana, knotted at the top and weighing approximately one pound each. In the black bag were six Saran-wrapped brick-shaped packages of marijuana, each weighing approximately one pound. The black bag also contained scented fabric softener sheets and a large amount of dry scented detergent granules. Although the detergent masked the smell of the marijuana, one brick was gashed and the officers could smell the marijuana when they opened the bag.

In the hallway closet, officers found more athletic bags, similar in shape and size to the other two. These bags also contained scented detergent granules.

In total, the officers found approximately 19 pounds of marijuana in the search.

Officer Rivera of the Major Narcotics Bureau Task Force testified that marijuana was generally priced from $500 to $1,500 per pound, depending on the quality. He examined the documents found in the kitchen and opined that some of the notations referred to different strains of marijuana commonly found in Fresno. He believed the numbers represented the price per pound. One of the documents included names or aliases with amounts showing how much each person owed or paid. The word "pay" appeared four times on the document.

Officer Rivera explained that personal use of marijuana is generally accompanied by the user's paraphernalia, such as cigarette papers, bongs, and pipes, none of which was recovered in this search.

Officer Rivera was familiar with the Compassionate Use Act. He conducted compliance checks of people using medical marijuana. In this case, the large amount of marijuana, the way it was packaged, and the lack of paraphernalia led Officer Rivera to believe defendant possessed the marijuana for sale. The knotted bags were common in large-scale sales of marijuana, and packaging in pound increments usually involved sales of large quantities of marijuana. Street-level sales usually involved smaller baggies containing ounces or less. In his opinion, this case appeared to involve sales of large quantities of marijuana, not street-level sales. The fact that no money was found did not

change his opinion because dealers often kept their money at a separate location so confiscation of both the drugs and money by police would be more difficult.

Marijuana in knotted bags would deteriorate and become stale within a year, whereas marijuana in heat-sealed packages would not deteriorate as fast.

The documents found in defendant's kitchen monitored the values of various types of marijuana. This would allow defendant to know the price at which he should buy or sell the marijuana.

Criminalist DeSlate tested the material and determined it contained marijuana. He opined that 0.01 gram of marijuana was a usable amount to smoke in a cigarette or pipe.

According to the police report, defendant stated that he was allowed to possess six pounds of dried marijuana.

### Defense Evidence

Defendant was the sole defense witness. He explained that he began using marijuana for pain relief because he was robbed and shot in 1997. His bones contained metal pins that caused him severe pain that failed to respond to most pain treatments. He went to Dr. Brubaker with his medical records and received a medical marijuana recommendation. Defendant tried smoking and eating the marijuana, but he preferred making an oil and applying it topically. Smoking the marijuana gave him a headache, although he had to smoke it at work because he could not apply the oil there. He learned to extract the oil from watching a YouTube video. He needed 12 pounds of marijuana to create 33 ounces of oil.

Defendant explained that when the police questioned him, he told them he had a medical marijuana card. He also had a growing certificate that was a recommendation from the doctor prescribing 80 mature marijuana plants. The documents found in his kitchen tracked the purchases he made when his own marijuana crop died. His crop was no good and he could not grow anything, so he had to buy his marijuana.

On cross-examination, defendant testified that he was not aware Dr. Brubaker had been under investigation or that his license had been revoked for a year.

Defendant explained that making the marijuana oil required 12 pounds of marijuana buds, about two-and-one-half gallons of hot water, plus a scoop of sugar. He mixed it in a very large wooden pan, about four feet tall and two-and-one-half feet wide, set something heavy on top of it, and let it sit for a week or so. This made about 33 ounces of oil, which would last him three to four months.

His own crop was on a quarter of an acre that he rented and would pay off in four months. He planted only 20 plants because he could not take care of more by himself. When his crop died, he bought marijuana from people he knew, most of whom were growing marijuana near his house. He knew them only by first names. They felt sorry for him because his crop had died, and they sold him marijuana for as little as $100 per pound. He did not know or could not remember what all the notations on his documents referred to. He thought the notation that appeared to spell "P-A-Y" actually spelled his nickname "R-A-Y."

Defendant remembered telling Officer Dorian that he had a medical marijuana card and was allowed to have six pounds of marijuana at a time. He told her he applied the marijuana as oil or ingested it in food. He pointed the officers to the storage bedroom where they found the two athletic bags. He remembered telling Officer Dorian that he grew 20 marijuana plants and harvested 23 pounds of marijuana, but he testified that in fact the crop had died and he harvested nothing; he had purchased all the marijuana. Of the 19 pounds found, defendant identified 17 pounds as his and remembered purchasing them. He made up the 23 pounds for the officer because he wanted it to sound like he grew the marijuana rather than purchased it. He did not know whether it was legal for him to purchase it. He bought the marijuana to make more oil, but he had not yet had the chance. He told Officer Dorian that he smoked one-quarter ounce a day, due to his

recommendation. He was just answering her questions however he felt like it. He was not under oath.

He did not remember telling Officer Dorian that he returned the 23 pounds and got 10 pounds in exchange, that after he smoked some of the new marijuana he decided he did not like that either, or that he then packaged some of it to return to his dealer who was not working on Christmas. He never told her he was returning anything. He did not remember Officer Dorian asking him about the Saran-wrapped bricks of marijuana and why some of the marijuana was wrapped that way, as if ready to be transported. He remembered telling her he did not transport or sell any marijuana. He remembered telling her he vacuum sealed one-quarter of an ounce of marijuana to take to work so others could not smell it. His growing certificate allowed him three plus ounces per week.

He remembered telling Officer Dorian he had never seen the ammunition found in the drawer and he did not know it was there. He told her the drawer was full of junk and he did not look in it. There were car keys in the drawer, but they belonged to vehicles he used for parts, not to vehicles he drove. He did not remember telling her that maybe his brother left the ammunition on the counter and defendant then swept it into the drawer.

On redirect examination, he explained that during the search he was handcuffed to his couch and his children were crying everywhere. Four to six officers were "basically destroying the whole house." They went through everything, flipped couches, and pulled out the television and refrigerator. The drawer with the ammunition contained at least 20 keys to cars that he used for parts and that did not even run. Earlier that Christmas Day, when the house was full of 50 guests, he told them to throw things into the drawers to clear off the kitchen island for food. He kept his own car keys with his wallet in the bedroom. He never sold drugs to anyone.

## BACKGROUND

Before the above evidence was presented, the trial court addressed the prosecutor's motions in limine and the following occurred:

> "[THE COURT:] With respect to the People's … motion in limine number one, which objects to defense evidence on the grounds that the—no witness list or witness statements have been provided, the court will take that up if and when the defense does introduce or attempt to introduce any third party witnesses.

> "With respect to [the People's motion in limine number two asserting that] the alleged medical marijuana card for [Mr.] Sihavong is hearsay and irrelevant pursuant to the Evidence Code[, i]t's a medical marijuana card that was located in the garage; is that correct?

> "[DEFENSE COUNSEL]: It was located in the house, I believe.

> "THE COURT: Okay.

> "[DEFENSE COUNSEL]: Garage.

> "THE COURT: And the alleged relevance of that?

> "[DEFENSE COUNSEL]: The relevance of the card is that there were a number of people using the house. All these people are part of the collective that [defendant] participates in. My understanding, Mr. [Sihavong] also grew marijuana for personal use and kept his marijuana with his card in case of a raid, like in this situation.

> "THE COURT: So the contention—essentially, the contention of the defense is this place was a medical collective?

> "[DEFENSE COUNSEL]: It wasn't a medical collective.

> "THE COURT: I misunderstand you, then.

> "[DEFENSE COUNSEL]: This place was used by a number of people to store their marijuana, and Mr. [Sihavong's] marijuana was stored there as well with his medical marijuana card, basically, identifying his marijuana from others.

> "THE COURT: And this is something, basically, that you will be presenting evidence to?

7.

"[DEFENSE COUNSEL]:  Well, I wasn't planning to address Mr. [Sihavong's] involvement in this matter.  But since the evidence was raised, I would present evidence why Mr. [Sihavong's] marijuana was in the garage with [defendant's] marijuana.

"THE COURT:  So the contention, essentially—I assume you would be presenting evidence to this effect, the portion of the marijuana located in the house that your client is charged with possessing, was actually owned by somebody else?

"[DEFENSE COUNSEL]:  Correct.

"THE COURT:  And the support for that position would be this medical marijuana card?

"[DEFENSE COUNSEL]:  It would be Mr. [Sihavong's] testimony or a card.

"THE COURT:  So the anticipation is Mr. Sihavong would be testifying?

"[DEFENSE COUNSEL]:  Yes.

"THE COURT:  And the anticipation would be that Mr. Sihavong would be testifying that some of the marijuana in the house was his?

"[DEFENSE COUNSEL]:  Correct.

"THE COURT:  And is Mr. Sihavong represented by counsel?

"[DEFENSE COUNSEL]:  No.

"THE COURT:  Is there going to be a request for the court to appoint counsel to advise him of his—any privilege he might have?

"[DEFENSE COUNSEL]:  Your Honor, Mr. Sihavong was charged with possession of marijuana.  And I believe it's the same marijuana that he's been charged and he's already pled and served out his sentence.

"THE COURT:  So the contention is he no longer has a privilege with respect to this?

"[DEFENSE COUNSEL]:  I don't believe he has a privilege at this point.

"THE COURT:  Do we have the case number?

8.

"[DEFENSE COUNSEL]:  I can get it over the lunch hour.

"THE COURT:  Okay.

"[PROSECUTOR]:   Your Honor, I'm, obviously, a bit confused here.  There is no co-defendant in this case.  I'm not aware that Mr. Sihavong was charged with marijuana that was found in this home.  This would not be a rebuttal witness.  This would be actual evidence the defense is putting on, which is why I asked for motion in limine number one.

"THE COURT:  I understand.  The court's a little unclear, also.

"So your contention, if I understand you correctly, [defense counsel], is that a portion of the marijuana—or the defense contention here is that a portion of the marijuana which [defendant] is charged with possessing is actually somebody else's marijuana, and that somebody else has already been charged with and convicted of possession of that marijuana.

"[DEFENSE COUNSEL]:  Not that marijuana.

"THE COURT:  Well, if it's not that marijuana, it would be, it seems to the court, needing some advice on the question of whether or not he has a privilege with respect to this marijuana.  Because in theory the prosecution could charge him with possession of this marijuana if he were to get on the stand and admit that he possessed it.

"[DEFENSE COUNSEL]:  I understand.

"THE COURT:  So when would he be available and the court can work to secure counsel for him?  We'll look up his case.  We'll see who his counsel was.

"[DEFENSE COUNSEL]:  I was his counsel, Your Honor.

"THE COURT:  Okay.  Well, we would need to arrange for him to be advised by independent counsel, it seems to the court, with respect to the question of whether or not he has a privilege and whether he wishes to exercise that privilege.  [¶]  It seems I'm not able to rule on motion number two by the People without knowing the question whether that particular witness would testify.

"So are there other individuals that it is anticipated I will have this same issue with?  In other words, they will come in and say that a portion of the marijuana was theirs?

9.

"[DEFENSE COUNSEL]: No, Your Honor."

Following the lunch break, the following occurred:

"[PROSECUTOR:] I'm also concerned now about a new development that after I think we made a record this morning that Mr. Sihavong would be a potential defense witness and that he'd be claiming some of the marijuana. It's now [my] understanding that won't happen. That is a concern that there was a defense this morning and now there is not. [¶] I would be asking for some time to sort all of this out …. [¶] … [¶]

"I'd also like to flesh out with my bosses that there was a potential defense to Count 1 that was stated for the record and now there's not. I don't want there to be a motion later on that a defense that was brought up wasn't actually developed in trial. I'm concerned about ineffective assistance of counsel.

"THE COURT: They can raise and not raise whatever defenses they choose. The court has not made any ruling precluding any potential defense at this point. And, therefore, I don't think there is grounds based on that. [¶] I will say, in my experience, frequently we have thoughts about either defenses or prosecution strategies that are altered as the case develops. So I'm not too worried about that."

After the discussion had turned to other issues, the following occurred:

"[PROSECUTOR]: Going back to the motion in limine number two with respect to the marijuana card for the witness who is no longer being called, I'm not sure if we need to readdress that now.

"THE COURT: All right. How about that question? Her motion [in] limine number two with respect to excluding the marijuana card for Phadthin Sihavong, do you wish to be heard with respect to that motion?

"[DEFENSE COUNSEL]: No.

"THE COURT: Okay. Then the court will grant that motion."

## DISCUSSION

"A criminal defendant is guaranteed the right to the assistance of counsel by the Sixth Amendment to the United States Constitution and article I, section 15 of the California Constitution. This constitutional right includes the correlative right to

10.

representation free from any conflict of interest that undermines counsel's loyalty to his or her client. [Citations.]" (*People v. Doolin* (2009) 45 Cal.4th 390, 417.)

"Conflicts of interest broadly embrace all situations in which an attorney's loyalty to, or efforts on behalf of, a client are threatened by his responsibilities to another client or a third person or by his own interests. [Citation.] [¶] Conflicts spring into existence in various factual settings. For example, conflicts may arise in circumstances in which one attorney represents more than one defendant in the same proceeding. [Citations.] In such cases there is at least the possibility that 'the interests of the defendants may diverge at some point so as to place the attorney under inconsistent duties' [citation] and thereby undermine his loyalty to, or efforts on behalf of, one or all. Such a conflict, it is plain, can result in the infringement, or even the denial, of the defendant's constitutional right to the effective assistance of counsel." (*People v. Bonin* (1989) 47 Cal.3d 808, 835 (*Bonin*).)

"Conflicts may also arise in situations in which an attorney represents a defendant in a criminal matter and currently has or formerly had an attorney-client relationship with a person who is a witness in that matter. [Citations.] [¶] Such a conflict springs from the attorney's duty to provide effective assistance to the defendant facing trial and his fiduciary obligations to the witness with whom he has or had a professional relationship. [Citation.] 'An attorney is forbidden to use against a [present or] former client any confidential information … acquired during that client relationship. [Citations.] Moreover, the attorney has a duty to withdraw, or apply to a court for permission to withdraw, from representation that violates those obligations. [Citation.] So important is that duty that it has been enforced against a defendant's attorney at the instance of his former client (who was also a codefendant) even at the expense of depriving the defendant of his choice of counsel. [Citation.]' [Citation.] In a word, a conflict based on the attorney's obligations to a criminal defendant and to a present or former client, 'as well as conflicts arising out of simultaneous representation of codefendants, may impair a

defendant's constitutional right to assistance of counsel.' [Citation.]" (*Bonin, supra,* 47 Cal.3d at p. 835.)

"In order to safeguard a criminal defendant's constitutional right to the assistance of conflict-free counsel and thereby keep criminal proceedings untainted by conflicted representation, the United States Supreme Court has laid down certain essentially prophylactic rules in this area." (*Bonin, supra,* 47 Cal.3d at p. 836.)

The law is well settled that "[w]hen a trial court knows or should know that defense counsel has a possible conflict of interest with his client, it must inquire into the matter [citations] and act in response to what its inquiry discovers [citation]." (*People v. Jones* (1991) 53 Cal.3d 1115, 1136.) "A trial court's failure to carry out its duty to conduct such an inquiry, or to take action based on the results of its inquiry, denies the defendant the right to due process." (*People v. Frye* (1998) 18 Cal.4th 894, 999, disapproved on another ground by *People v. Doolin, supra,* 45 Cal.4th at p. 421, fn. 22.)

"When in violation of its duty the trial court fails to inquire into the possibility of a conflict of interest or fails to adequately act in response to what its inquiry discovers, it commits error under *Wood v. Georgia, supra*, 450 U.S. 261. [Citation.] [¶] To obtain reversal for *Wood* error, the defendant need not demonstrate specific, outcome-determinative prejudice. [Citation.] But he must show that an actual conflict of interest existed and that that conflict adversely affected counsel's performance. [Citations.]" (*Bonin, supra,* 47 Cal.3d at pp. 837- 838.)

Here, defendant does not attempt to show that an actual conflict of interest existed or that the conflict adversely affected defense counsel's performance. Rather, relying upon *Wood v. Georgia, supra,* 450 U.S. 261, he argues that the matter should be remanded to the trial court to conduct a hearing to determine whether there was a conflict of interest. Indeed defendant admits "it is difficult to determine from the record whether or not [defense counsel] actually had a conflict of interest." But he contends the possibility of a conflict was sufficiently apparent to impose upon the trial court a duty to

inquire further.  This breach of duty, he explains, requires that we vacate the judgment and remand the case for a hearing on whether a conflict of interest actually existed.

In response, the People argue that any conflict was resolved and, in any event, defendant has not shown that the alleged conflict adversely affected defense counsel's performance.

In his reply brief, defendant states:  "It is unclear why [the People are] arguing tactical choice, failure to demonstrate a conflict of interest, or a failure to demonstrate that defense counsel's performance was adversely affected as a result of a conflict of interest.  [Citation.]  [Defendant] did not argue in his opening brief that [defense counsel] had a conflict of interest.  Rather [defendant] argued that the trial court had sufficient knowledge of a potential conflict of interest to invoke the trial court's duty to investigate….  [The People's] argument about tactical choices and demonstrated compromised defense counsel performance is not part of the analytical framework involved in a trial court's duty to investigate and thus is misplaced."

But, as our outline of the law demonstrates, this is inaccurate.  Accordingly, we consider whether defendant has shown the existence of an actual conflict that adversely affected defense counsel's performance.

Defense counsel explained to the court that Mr. Sihavong, whom counsel had represented in a prior and separate marijuana case, would testify that some of the marijuana in defendant's house belonged to him.  As the court and counsel understood, this testimony would have incriminated Mr. Sihavong, who had not been charged in this case.  Thus, it is likely he would have declined to testify for this reason.  But even if he had testified, his testimony that some of the marijuana was his would not have relieved defendant of his criminal liability for the portion that he possessed, unless the testimony would have established that Mr. Sihavong owned all of the marijuana that was ostensibly packaged for sale and any other evidence supporting the inference of sales, such as the documents and scales, and that defendant possessed only a small amount for personal

13.

use. In that case, his criminal liability might have been reduced to mere possession. But defense counsel did not suggest that Mr. Sihavong's testimony would be so broad and exculpatory. In light of these facts, it is not at all clear that defense counsel was faced with a conflict that divided his loyalties between his prior client, Mr. Sihavong, and his current client, defendant. Defendant has not shown that an actual conflict of interest existed or that, if it existed, it adversely affected defense counsel's performance.

## DISPOSITION

The judgment is affirmed.