**UNITED STATES, Appellee,**

v.

**Luis Alfredo ALVARADO, Defendant, Appellant.**

**UNITED STATES, Appellee,**

v.

**Juan Eugenio LORENZI–PADILLA, Defendant, Appellant.**

**Nos. 91–2075, 91–2076.**

United States Court of Appeals, First Circuit.

Heard May 5, 1992.

Decided Dec. 31, 1992.

Jose F. Quetglas Jordan with whom Eric M. Quetglas Jordan, San Juan, PR, was on brief, for defendant, appellant Luis Alfredo Alvarado.

Eric M. Quetglas Jordan with whom Jose F. Quetglas Jordan, San Juan, PR, was on brief for defendant, appellant Juan Eugenio Lorenzi–Padilla.

Jose A. Quiles–Espinosa, Asst. U.S. Atty., with whom Daniel F. Lopez Romo, U.S. Atty., and Jeanette Mercado Rios, Asst. U.S. Atty., Hato Rey, PR, were on brief, for appellee.

Before BREYER, Chief Judge, CYR, Circuit Judge, and BOYLE,* District Judge.

* Of the District of Rhode Island, sitting by designation.

FRANCIS J. BOYLE, District Judge:

Luis Alvarado and Juan Lorenzi appeal from judgments of conviction for aiding and abetting the possession with intent to distribute approximately 267.6 kilograms of cocaine stipulated to be worth between $60 million and $100 million in violation of 46 U.S.C. App. § 1903(a), (c)(1)(D), (f), & 18 U.S.C. § 2, and the importation of cocaine into the customs territory of the United States in violation of 21 U.S.C. § 952(a) & 18 U.S.C. § 2. Both appellants claim that there was insufficient evidence to establish that appellants intentionally possessed the cocaine with intent to distribute it and that there was insufficient evidence to show that the cocaine was imported into the customs territory of the United States. After careful consideration of the record, we affirm.

## I. Background

On the evening of March 19, 1991, a United States Customs Service aircraft acquired a suspect aircraft on its radar device and on a Forward Looking Infrared System ("FLIR") approximately 185 miles southwest of Ponce, Puerto Rico. The suspect aircraft was heading northeast, traveling without navigation lights at an altitude of about 3000 feet.

The Customs Service aircraft pursued the suspect aircraft at a distance of half-a-mile. After about one hour and twenty minutes, the pilot of the Customs Service aircraft noticed the lights of two vessels in the water. The vessels were located approximately twenty miles southwest of Santa Isabel, which is near Ponce. The suspect aircraft descended to about 300 to 500 feet off the water, just above the two vessels, and then began a series of hard maneuvers, sometimes turning ninety degrees or greater.

After about fifteen minutes of maneuvering by the suspect aircraft, the pilot of the Customs Service aircraft noticed a string of approximately twenty-five lights in the water. Based on his experience, the pilot suspected that the string of lights he observed were chem lights, which are often attached to narcotic airdrops for visibility.

The pilot reported a possible airdrop, and a Customs Service Nomad aircraft thereafter took over surveillance of the two vessels on both radar and FLIR. The vessels were traveling at about twenty to twenty-five miles-per-hour in a northbound heading. Both vessels were traveling without navigation lights. The Nomad began a half-mile orbit around the vessels and radioed the state police that two vessels suspected of drug smuggling were headed towards the shore.

At about 11:30 P.M., the two vessels, which had been traveling together at a distance of approximately 100 yards, began to separate. The first vessel continued in a northbound heading, while the second vessel veered off in a more westerly direction. To maintain surveillance on both of the diverging vessels, the Nomad kept its FLIR trained on the first vessel and its radar trained on the second vessel.

A state police helicopter was directed over the first vessel. The helicopter was well lit and duly identified as a police helicopter by twelve- to sixteen-inch lettering spelling "FURA" for police as well as displaying a coat of arms. A sergeant in the helicopter signalled the co-defendants aboard the first vessel, Angel Morales and Wilfredo Cartagena, to cut the engine and stop the boat. Initially, the co-defendants reduced their speed, but then accelerated again and continued moving towards the shore. As the first vessel tried to escape, the police helicopter alerted land base and seaborne units. The helicopter began to orbit the vessel while awaiting the arrival of a police boat. A police boat with flashing lights approached the first vessel soon thereafter. The co-defendants initially attempted evasive maneuvers, but were eventually detained and arrested.

After the police helicopter had reported its location as overhead the first vessel, the Nomad turned southwest toward the second vessel and began orbiting it. The police helicopter flew to the area of the Nomad and the second vessel once the first vessel was in custody. At that time, the two vessels were approximately five miles apart. The helicopter maneuvered itself

just above the second vessel, which still had its navigation lights off. The police crew illuminated the vessel with a hand-held lamp and observed appellants Juan Lorenzi and Luis Alvarado and four bales of possible contraband on board. Appellants initially ignored police commands to turn off the motor and stop the boat. After a short pursuit, however, appellants stopped the vessel. A police sergeant jumped from the police helicopter onto appellants' vessel and placed appellants under arrest.

In addition to the four bales of possible contraband, several chem lights were found hidden in the stern of the second vessel. Pieces of matching ribbon of the bales were still attached to the chem lights. Also found on board the second vessel were two spare gas tanks, two lamps, and unused fishing equipment. There was no bait found on board. Appellant Luis Alvarado nevertheless claimed that he and Juan Lorenzi had laid a fish net that evening in an area called "El Investigador," which is seven or eight miles off the coast, when they heard the sounds of objects falling into the water and saw floating lights. They headed toward the lights and then heaved the bales onto the second vessel. Mr. Alvarado admitted that he thought the bales contained contraband, but claimed that he and Mr. Lorenzi were en route to the police station where they intended to relinquish the bales.

On March 20, the day after the arrests, a police aircraft returned to the airdrop site and observed an additional seven bales of cocaine floating in the water. They were only able to retrieve four of these bales. The substance in these bales as well as the bales found on board the second vessel later tested positive for cocaine with a weight of 267.6 kilograms and a purity of ninety-five percent.

## II. Discussion

### A. *Sufficiency of Evidence of Intent*

Appellants contend that there was insufficient evidence to prove that they intentionally possessed the cocaine with the intent of importing or distributing it. This argument fails. We review the convictions only for clear and gross injustice because appellants failed to renew their motions for judgments of acquittal under Fed. R.Crim.P. 29(a) after presenting evidence on their own behalf. *United States v. Hadfield*, 918 F.2d 987, 996 (1st Cir.1990); *United States v. Clotida*, 892 F.2d 1098, 1102–03 (1st Cir.1989).

Appellants fail to meet this standard. There was evidence for the jury to conclude that appellants were guilty beyond a reasonable doubt. Appellants were in one of two vessels over which a suspect aircraft hovered. The suspect aircraft met the profile criteria of a drug transporting aircraft in that it had no lights, no flight plan, and was flying at a dangerously low altitude. It made a series of hard maneuvers approximately three hundred to five hundred feet above the appellants' vessel. Both vessels appeared to be signalling the suspect aircraft with their lights. The vessels then turned their navigation lights off and headed towards the shore once appellants had retrieved four bales of cocaine from the water. The jury could reasonably infer that the vessels were attempting to evade detection by law enforcement officials. This inference is further strengthened by the fact that appellants attempted to avoid the police helicopter that was well lit and clearly identified by lettering, twelve to sixteen inches high, and a coat of arms on the side.

The jury quite reasonably declined to believe Luis Alvarado's tale that he and Juan Lorenzi possessed the cocaine only because they were en route to turn it over to the police. Appellants importuned the jury to believe that they heard bales of cocaine drop into the water twenty miles southwest of Puerto Rico, while they were fishing in "El Investigador," which is only seven or eight miles off the coast. Moreover, fishing gear was not in working order and there was no bait found aboard their vessel. Nor was the fishing net they cast upon the water recovered in the area of "El Investigador." The jury could reasonably have found the appellants' version of the events that night to be incredible. Since

the evidence overwhelmingly supports the verdicts of the jury, appellants' convictions are not grossly unjust.

## B. *Importation*

 Appellants' second claim of error is more meaningful. Appellants contend that the district judge incorrectly instructed the jury as to the element of importation. Appellants, however, neither objected to the trial court's instructions nor proffered additional or different instructions of their own. As a result, appellants forfeited the right to ordinary review. We can reverse their convictions only if the lower court's instructions amount to plain error. *See United States v. Natanel*, 938 F.2d 302, 311 (1st Cir.1991), *cert. denied,* —— U.S. ——, 112 S.Ct. 986, 117 L.Ed.2d 148 (1992). As we have stated before, plain errors are "those errors so shocking that they seriously affect the fundamental fairness and basic integrity of the proceedings conducted below." *United States v. Griffin*, 818 F.2d 97, 100 (1st Cir.1987), *cert. denied*, 484 U.S. 844, 108 S.Ct. 137, 98 L.Ed.2d 94 (1987). "It follows, unsurprisingly, that the plain error exception is to be used 'sparingly,' only to prevent justice from miscarrying." *United States v. Hunnewell*, 891 F.2d 955, 956 (1st Cir. 1989).

 The relevant statute, 21 U.S.C. § 952(a), states that "[i]t shall be unlawful to import into the customs territory of the United States from any place outside thereof (but within the United States), or to import into the United States from any place outside thereof, any controlled substance ..." Thus, a critical element of the offense of importation is that a defendant imports or causes to be imported a controlled substance into the customs territory of the United States. *United States v. Nusraty*, 867 F.2d 759, 766 (2d Cir.1989); *United States v. Samad*, 754 F.2d 1091, 1096 (4th Cir.1984). The district judge instructed the jury that:

> Customs waters of the United States, as they relate to a United States vessel, are the waters around the vessel irrespective of distance from the United States, with-

in which the United States may enforce its law if the vessel is hovering off the coast of the United States and is suspected of smuggling ...

A hovering vessel in the context of this instruction, means a vessel found or kept off the coast of the United States, if from history, conduct or character or location of the vessel, it is reasonable to believe that such vessel is being used or may be used to introduce, promote or facilitate the introduction or attempted introducing of contraband into the country.

The statute defines "customs territory of the United States" as having the meaning assigned to it by general note 2 of the Harmonized Tariff Schedule of the United States. 21 U.S.C. § 951(a)(2). General note 2, however, merely states that the customs territory of the United States includes only the States, the District of Columbia, and Puerto Rico. Although general note 2 fails to provide a meaningful standard for determining what constitutes the customs territory of the United States, it is well settled that the outer limits of the customs territory of the United States extend only twelve miles from the coast. *See United States v. Lueck*, 678 F.2d 895, 905 (11th Cir.1982); *United States v. Seni*, 662 F.2d 277, 286 (4th Cir.1981), *cert. denied*, 455 U.S. 950, 102 S.Ct. 1453, 71 L.Ed.2d 664 (1982); *United States v. Williams*, 617 F.2d 1063, 1073 n. 6 (5th Cir.1980) (en banc). Thus, the jury should have been more specifically instructed that in order to find that appellants imported a controlled substance within the meaning of 21 U.S.C. § 952(a), the contraband must have come into the twelve-mile outer limit of the customs territory of the United States. *See United States v. Nueva*, 979 F.2d 880, 884 (1st Cir.1992); *see also United States v. Goggin*, 853 F.2d 843, 845 (11th Cir.1988). There is no record, however, that anyone called this to the attention of the District Judge.

 Although the district court's instructions were incomplete, we must consider the instructions in their entirety and in the context of the entire trial in evaluat-

ing a claim of plain error. *See United States v. Weston*, 960 F.2d 212, 216 (1st Cir.1992). Furthermore, we must view the evidence in the light most favorable to the verdict. *See United States v. Batista–Polanco*, 927 F.2d 14, 17 (1st Cir.1991). The government contends that appellants' vessel entered the twelve-mile customs limit because of evidence that the police helicopter hovered over appellants' vessel at Jobos Bay, which is seven or eight miles from shore. The evidence however is that the helicopter, while awaiting the arrival of a police boat, hovered over the first vessel operated by co-defendants, not the second vessel, which was operated and occupied by appellants. Appellants' boat had separated from co-defendants' boat approximately twelve (12) minutes earlier and headed in a westerly direction, roughly parallel with Puerto Rico's southern coast. Nothing in the record indicates that appellants' boat travelled significantly further away from the coastline after the separation. Accordingly, the relative position of co-defendant's boat, which was apprehended just minutes after the vessels separated, is at least some evidence that appellants boat also crossed the twelve-mile customs territory limit.

The government also cites to the testimony of Luis Alvarado that appellants had allegedly laid a fishing net in the area of "El Investigador", an area seven or eight miles from shore. The jury obviously did not believe certain aspects of appellant's "fish tale" or else they would not have convicted appellants. No one, however, denies Mr. Alvarado's statements that, while headed toward shore with cocaine on board their vessel, he and Mr. Lorenzi passed through "El Investigador", well within the twelve-mile limit. In fact, in his opening statement, appellants' trial counsel told the court and jury "[t]he only issue in this case is whether or not Luis and Juan possessed those bales of cocaine with the intention of delivering them to the police authorities in the police headquarters in Salinas." Trial Transcript at 57. "At around 6:00 o'clock in the afternoon Juan and Luis left the coast on Juan's fishing boat and headed toward El Pescador, a fishing area seven or

eight miles away from the coast." Trial Transcript at 59. Although counsel's statements are not evidence, they do indicate that counsel had no intention of disputing the fact that appellants were within the twelve mile limit. In light of such representations, it would be particularly unreasonable to expect the district court to have thought of the precisely correct instruction on its own.

Finally, a mark made on an aeronautical chart, presented to the jury as Joint Exhibit 1, provides additional evidence that appellants entered the twelve-mile customs limit. This mark was made by the radar operator of the Nomad in the course of testifying as to the various positions of the vessels after the airdrop up until the arrests. The government did not specifically ask the radar operator the distance between the mark and the Puerto Rican shoreline. Using the chart's mileage scale, however, the mark establishes that appellants were taken into custody at a point about seven miles from the coastline. The radar operator's mark, taken together with the relative position of co-defendants' boat and Luis Alvarado's statement that appellants passed through "El Investigador", is credible evidence that the element of importation was met. In contrast, there is no evidence that remotely suggests that appellants were taken into custody at a point beyond 12 miles from the coast.

As we have stated before, "[t]he plain error hurdle is high." *See United States v. Hunnewell*, 891 F.2d 955, 956 (1st Cir. 1989). Appellants have failed to clear this height. To hold differently would permit appellants to benefit from their own failure either to object to the jury instructions at trial or to propose an appropriate instruction to the court. We cannot promote "sandbagging" of this type. As a matter of policy, we stress the importance of making contemporaneous objections to jury instructions and the duty to assist the court to accomplish an error free trial. In sum, appellants have not presented "the rare case in which [a lack of] instruction will justify reversal of a criminal conviction when no objection has been made in the

trial court." *See Henderson v. Kibbe*, 431 U.S. 145, 154, 97 S.Ct. 1730, 1736, 52 L.Ed.2d 203 (1977).

### III. Conclusion

The evidence overwhelmingly supports the jury verdicts as to the charge of aiding and abetting the possession with intent to distribute cocaine, and we affirm the appellants' convictions under 46 U.S.C. App. § 1903(a), (c)(1)(D), (f), & 18 U.S.C. § 2. Furthermore, the district court's instruction on the element of importation does not amount to plain error. Therefore, we also affirm appellants' convictions for the importation of cocaine into the customs territory of the United States in violation of 21 U.S.C. § 952(a) & 18 U.S.C. § 2.

*Affirmed.*