UNITED STATES, Plaintiff–Appellee,

v.

Julio CONEO–GUERRERO,
Defendant–Appellant.

UNITED STATES, Plaintiff–Appellee,

v.

Juan Jose ARANGO–HERRERA
Defendant–Appellant.

UNITED STATES, Plaintiff–Appellee,

v.

Jesus A. VILLA–CONTRERAS,
Defendant–Appellant.

Nos. 96–1764 to 96–1766.

United States Court of Appeals,
First Circuit.

Heard Feb. 24, 1998.

Decided July 14, 1998.

 

Zygmunt G. Slominski on brief for appellant Julio Coneo–Guerrero.

Carmen R. De Jesus on brief for appellant Juan Jose Arango–Herrera.

Jorge A. Toro–McCown on brief for appellant Jesus A. Villa–Contreras.

Jacabed Rodriguez Coss, Assistant United States Attorney, with whom Guillermo Gil, United States Attorney, and Jose A. Quiles–Espinosa, Assistant United States Attorney, were on brief for appellee.

Before TORRUELLA, Chief Judge, CAMPBELL, Senior Circuit Judge, and SELYA, Circuit Judge.

CAMPBELL, Senior Circuit Judge.

After a jury trial, the district court convicted Julio Coneo–Guerrero, Juan Jose Arango–Herrera, and Jesus A. Villa–Contreras of importing into the United States and possessing with intent to distribute 543 kilograms of cocaine. 21 U.S.C. §§ 952(a), 841(a)(1). The three Defendants appeal from their convictions and sentences, citing many purported errors. We affirm. In so doing, we discuss only the most salient points. We have, however, considered carefully all the arguments Appellants raise.

## BACKGROUND

In reviewing a judgment of conviction, we view the facts in the light most favorable to the government. *See United States v. Christopher*, 142 F.3d 46, 48 (1st Cir.1998).

On the night of June 27–28, 1995, U.S. Customs pilots flying approximately fifteen miles from the southern coast of Puerto Rico spotted a forty-foot boat traveling rapidly north toward Puerto Rico with its lights out. Joined by other agents on sea and in the air, the agents tracked the boat until it stopped at an area within three miles of the coast of Puerto Rico known as Cayo Cabuzazos. There, the agents used night vision goggles to observe the boat's crew dumping objects overboard into the water.

To improve the scene's visibility, the agents summoned a helicopter equipped with a powerful "night sun" searchlight, which they directed at the boat. Realizing that they had unwanted company, the crew immediately sped away toward the south. After a lengthy chase and with the help of a local marine police unit, Customs agents apprehended the boat roughly thirteen or fourteen miles from the coast of Puerto Rico. Agents boarded the ship and arrested all four members of the crew: the three Appellants, plus the boat's captain, who is now deceased.

While aboard, the agents made several discoveries. First, they observed that the boat's dashboard lights were covered with opaque tape, obscuring their glow from nighttime observation. Second, there were two hand-written notes on board. One contained five sets of coordinates plotting a route from Colombia to Puerto Rico. The other, written in Spanish, vaguely prescribed an allocation: "399 for the office [oficina]"; "85 for Nando"; "85 for Lindo"; and "5 for the crew." A later search revealed a pair of burlap sacks.

The significance of the sacks became apparent after a contemporaneous search of the Cayo Cabuzazos area, where Appellants had earlier been observed dumping items from their boat. There, agents found several burlap sacks floating in the water, along with hundreds of packages containing a total of 543 kilograms of cocaine. According to the trial testimony of a FBI expert, the sacks found aboard Appellants' boat were of the same color, make, composition, and construction as those found floating with the cocaine. Moreover, a second FBI expert testified that both sets of sacks contained traces of cocaine.

Upon their arrest, Appellants each explained that they had come to Puerto Rico to pick up money, although they could not say when or from whom. However, government agents testified at trial that neither Appellants nor their boat were carrying any document that would permit them to make a legal entry into Puerto Rico.

A week after the arrest, a federal grand jury indicted Appellants for aiding and abetting, 18 U.S.C. § 2, two substantive violations: possessing a controlled substance with intent to distribute, 21 U.S.C. § 841(a)(1), and importation of a controlled substance, 21 U.S.C. § 952(a). Upon learning that a single attorney, Miguel R. Calderon, planned on representing all Defendants, the magistrate held a *Foster* hearing. *See United States v. Foster*, 469 F.2d 1 (1st Cir.1972). The district court [ (Fuste, J.) ] held a second *Foster* hearing on August 22, 1995, about ten weeks before trial.

Calderon continued to represent all Defendants throughout the trial. The jury returned a verdict of guilty as to all Defendants on both counts on December 15, 1995. Prior to sentencing and after a third *Foster* hearing, the district court granted attorney Calderon's motion to withdraw from representing Defendants and appointed each separate counsel for purposes of sentencing and appeal. The district court sentenced each defendant to 235 months' imprisonment. This appeal followed.

## DISCUSSION

### 1. *Ineffective Assistance of Counsel*

■ Appellants argue that their convictions are procedurally invalid owing to the district court's having allowed Calderon to represent all of them at the trial. Because one defendant's interests may be adverse to another's, representation of multiple defendants by the same attorney may lead to serious conflicts and violate the Sixth Amendment's guarantee of effective counsel. *See Wood v. Georgia*, 450 U.S. 261, 271, 101 S.Ct. 1097, 67 L.Ed.2d 220 (1981). On the other hand, the Sixth Amendment right to choose one's own counsel includes the right to choose as a lawyer the representative of a co-defendant. *See Wheat v. United States*, 486 U.S. 153, 159, 108 S.Ct. 1692, 100 L.Ed.2d 140 (1988). Balancing these two aspects of the right to counsel—the right to conflict-free representation and the right to select one's counsel—requires that joint representation be permitted only if each defendant knowingly and voluntarily assumes the risk of potential conflicts.

■ Accordingly, Federal Rule of Criminal Procedure 44(c) provides that the district court must inquire into each instance of joint representation of multiple defendants, and must advise each defendant of his right to separate counsel.[1] In *Foster*, this court spelled out the proper procedure for apprising a defendant of his constitutional rights:

[I]t shall be the duty of the trial court, as early in the litigation as practicable, to comment on some of the risks confronted where defendants are jointly represented to insure that defendants are aware of such risks, and to inquire diligently whether they have discussed the risks with their attorney, and whether they understand that they may retain separate counsel, or if qualified, may have counsel appointed by the court and paid for by the government. For the time being, at least, we leave to the discretion to the trial court the exact time and form of the inquiry.

*Foster*, 469 F.2d at 5; *see also Bucuvalas v. United States*, 98 F.3d 652, 655 (1st Cir. 1996). Without an appropriate *Foster* hearing, the burden of persuasion shifts to the government to demonstrate the absence of any likelihood of prejudice from the conflict of interest. *See United States v. Hernandez–Lebron*, 23 F.3d 600, 606 (1st Cir.1994). However, if the record shows a satisfactory *Foster* hearing, the appellant bears the burden of "establish[ing] that an actual conflict of interest adversely affected his lawyer's performance." *Cuyler v. Sullivan*, 446 U.S. 335, 350, 100 S.Ct. 1708, 64 L.Ed.2d 333 (1980); *see also United States v. Mazzaferro*, 865 F.2d 450, 454–55 (1st Cir.1989). Appellants argue that none of the *Foster* hearings was adequate, shifting the burden of demonstrating a lack of actual conflict to the government. They contend that the court seriously erred in addressing them jointly, rather than separately, and in failing to discern precisely who had retained Calderon to serve as their attorney.

■ We disagree on both scores. First, our review of the record indicates that the district court conducted satisfactory *Foster* hearings. There were three such hearings in this case, two prior to trial. The two pretrial *Foster* hearings more than sufficed to ensure that Defendant–Appellants' acquiescence in joint representation comported with Rule 44(c).

The first hearing was conducted by the Magistrate just before the bail hearing. The Magistrate granted each of four court-appointed attorneys' request to withdraw from representing the four Defendants in light of Calderon's appearance. The Magistrate instructed Defendants regarding their constitutional right to adequate and independent representation, and that joint representation was not necessarily proper. The Magistrate then asked all the Defendants whether they understood the potential for conflicts and the difficulty of avoiding such conflicts. The Magistrate then described potential conflicts that could emerge during the course of proceedings, noting that the Defendants' level of culpability could vary; that one or more of the Defendants could cooperate in exchange for leniency; that the evidence might prove stronger against one Defendant compared to another both as to guilt and as to sentencing. The Magistrate also noted that if any of the Defendants wanted to testify at trial, it would place their shared counsel in an untenable position. Following these warnings, the Magistrate asked Defendants whether they desired representation by Calderon; they answered in the affirmative.

Finally, the Magistrate warned the Defendants that if any of them changed his mind after trial, it would be too late to conduct a new trial. Following the hearing, each Defendant executed an "Acknowledgment of Joint Representation Admonishment" also signed by their attorney Calderon.

---

1. Rule 44(c) provides in pertinent part:
   Whenever two or more defendants have been jointly charged ... and are represented by the same retained or assigned counsel or by retained or assigned counsel who are associated in the practice of law, the court shall promptly inquire with respect to such joint representation and shall personally advise each defendant of the right to the effective assistance of counsel, including separate representation. Unless it appears that there is good cause to believe no conflict of interest is likely to arise, the court shall take such measures as may be appropriate to protect each defendant's right to counsel.
   Fed.R.Crim.P. 44(c).

A few months before trial, the district court judge conducted a second *Foster* hearing. There, the court specifically noted that it had to appoint each defendant separate counsel "unless it appear[ed] that there [was] good cause to believe no conflict of interest was likely to arise." The court also enumerated myriad issues that potentially would give rise to a conflict of interest, including the inability of counsel to conduct independent investigations, the inability of counsel to enter into independent plea negotiations, the inability of counsel to seek immunity for one defendant to testify against another, the inability of counsel to communicate information gained from one client to another because of attorney-client privilege, the inability to waive the right to jury trial for any single defendant, the inability of counsel to represent individual interests in jury selection or the introduction of evidence, the inability of counsel to present evidence that is exculpatory for one defendant if inculpatory for another; the inability of counsel to argue in the alternative as to the level of culpability of each defendant, the inability of counsel to negotiate after trial on behalf of one defendant against another, and the inability of counsel to argue the Defendants' relative blame at sentencing. Calderon told the court, in the presence of Defendant–Appellants, that he had discussed the potential for conflict with each of them several times.

The court then inquired, ultimately with no clear answer, as to who was paying counsel for the Defendants and where that person's loyalties lay. The court then questioned each defendant as to his competency and capacity to understand what was being explained. Finally, after warning the Defendants that the emergence of a conflict "down the line" would not "stop the case," the court permitted Calderon to continue representing all the Defendants. From the time of the second *Foster* hearing in August, 1995, until after the trial and conviction in December, 1995, neither a Defendant nor Calderon suggested that the joint representation had led to a conflict of interest.

Between the verdict and sentencing, each of the three surviving Defendant–Appellants requested the assignment of new counsel. The district court then conducted a third *Foster* hearing, at which it ultimately granted the request for new counsel during sentencing and appeal. At this hearing, the district court questioned each of the Defendants about his choice of Calderon as attorney. Arango–Herrera complained about Calderon's tactical decisions during trial and his communication regarding the potential conflict. Each of the other two Appellants said that he was satisfied with Calderon's performance. Indeed, each said that they sought new counsel because they no longer had adequate funds to pay for Calderon's representation.

■ Appellants now argue that these apparently thorough procedures were inadequate. First, citing *United States v. Gilliam*, 975 F.2d 1050, 1053 (4th Cir.1992), and *United States v. Edwardo–Franco*, 885 F.2d 1002 (2d Cir.1989), they argue that the district court should have engaged Defendants in a "narrative" colloquy. Second, based on the Advisory Note to Rule 44(c), they claim that the district court should have addressed each defendant separately. Finally, they suggest that the district court erred in failing to advise them of their right to seek the assistance of an independent attorney in understanding the risks of joint representation. *See United States v. Romero*, 780 F.2d 981, 985 (11th Cir.1986).

We do not think that the district court erred by failing to do more than we have traditionally held a *Foster* hearing requires. While each of the procedures Appellants suggest might serve the interests motivating a *Foster* hearing,[2] their absence is not error

---

2. Regarding Appellants' objection that the court failed to address each Defendant separately, the short answer is that Appellants misconstrue both the record and Rule 44(c). That Rule provides that the court must "personally advise each defendant" of his rights. The record demonstrates that the district court did so in this case on three occasions, engaging each Appellant individually.

Appellants, however, would read the rule to require that the trial judge repeat the same admonishment for each defendant. This hyper-literal reading of the Rule's text would serve no purpose, other than dragging out *Foster* hearings. Moreover, the "personal" nature of the colloquy becomes important only when each defendant answers the judge's questions; in this regard,

where, as here, the record shows that the district court made a diligent inquiry—in this case, multiple inquiries—into whether the risks of joint representation were clear.[3]

In light of the adequacy of the *Foster* hearings, Appellants bear the burden of showing that the joint representation caused an actual conflict of interest. In this regard, Appellants point to the fact that the district court never pinpointed exactly who was paying Calderon to represent them; the source of those funds still remains a mystery. However, Appellants have failed to adduce any evidence of an actual conflict, though they hypothesize a number of potential conflicts relating to "the inherent dangers that arise when a criminal defendant is represented by a lawyer hired and paid by a third party." *Wood*, 450 U.S. at 268–69, 101 S.Ct. 1097. For instance, they point out that a conflict could have arisen if one of them had accepted the government's offer of a plea bargain. However, there is no credible suggestion that this or any other potential conflict ever occurred. Indeed, the problem with Calderon's representation appears not to have been disloyalty, but rather his lack of success and his cost. At the third *Foster* hearing, Arango told the district court that he did not become dissatisfied with Calderon's performance until they lost the case; the two other Appellants stated that they sought new counsel only because they could no longer afford Calderon. Accordingly, Appellants have failed to meet their burden of showing that an actual conflict arose adversely affecting Calderon's performance. *See Carey v. United States*, 50 F.3d 1097, 1100 (1st Cir.1995) ("[T]he defendant must demonstrate that the alleged conflict is more than 'some attenuated hypothesis having little consequence to the adequacy of representation.'" (quoting *Brien v. United States*, 695 F.2d 10, 15 (1st Cir.1982))); *Mazzaferro*, 865 F.2d at 454.

there is no suggestion that the district court ignored the plea of any individual defendant, making the hearings sufficiently "personal."

3. Appellants also claim in passing that the district court did not give them adequate time to consider the waiver of their rights. We reject

## 2. *Jury Instruction Regarding Reasonable Doubt*

Appellants fault the district court for not giving an unrequested jury instruction that reasonable doubt exists when upon viewing the evidence a reasonable juror would "hesitate to act" in finding the defendant guilty. Their theory is that the absence of such an instruction inappropriately reduced the government's burden of proof. We disagree.

█ "Reasonable doubt instructions are erroneous when, taken as a whole, they have a 'reasonable likelihood' of misleading the jury to believe that it can convict on some lesser standard of proof than that required under the reasonable doubt standard." *United States v. Romero*, 32 F.3d 641, 651 (1st Cir.1994). The trial court's instruction was in this regard quite clear:

> [r]emember that the defendants are presumed by law to be not guilty or innocent. The law does not require defendants to prove that they are not guilty or produce any evidence at all. The government has the burden of proving their guilty beyond a reasonable doubt. And if the government fails to do so, you must acquit the defendants.

Later, the court defined reasonable doubt as "a real doubt based upon reason and common sense after careful and impartial consideration of all the evidence in the case." Nothing in these passages, nor in any cited by Appellants, shifted the burden of proof from the government. Much less was the instruction's definition of "reasonable doubt" inadequate. We cannot find Appellants' preferred instruction plain error, *see United States v. Olano*, 507 U.S. 725, 737, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993) (defining plain error standard), particularly given the district court's "considerable latitude" in charging the jury, *see United States v. Cassiere*, 4 F.3d 1006, 1022 (1st Cir.1993).

this argument as only cursorily argued, *see United States v. Zannino*, 895 F.2d 1, 17 (1st Cir. 1990). Moreover, Appellants had ample time to consider their lot, as the first *Foster* hearing preceded their bail hearing, and the second occurred over two months before trial.

### 3. *Jury Instruction Regarding the Elements of Importation*

■ Next, Appellants criticize the court for failing to instruct the jury that the offense of importation, 21 U.S.C. § 952(a), requires that the defendant have brought contraband within the twelve-mile outer limit of the United States' customs territory. *See United States v. Alvarado*, 982 F.2d 659, 662 (1st Cir.1992) (explaining scope of 21 U.S.C. § 952(a)). Because Appellants did not object nor raise this contention at trial, our review is confined to plain error. *See United States v. Sullivan*, 85 F.3d 743, 748 (1st Cir.1996).

We have ruled that "[a] critical element of the offense of importation is that a defendant imports or causes to be imported a controlled substance into the customs territory of the United States." *Alvarado*, 982 F.2d at 662. In explaining the U.S.'s "customs territory," the district court here instructed the jury that

> [t]he term United States when used in the geographic sense that we are dealing with here, means all places and waters continental or insular subject to the jurisdiction of the United States. The territorial waters of Puerto Rico are territorial waters of the United States.

While the district court did not explain, as it might have, that the territory of the United States extended only twelve miles from the shores of Puerto Rico, in the present context its omission was not "plain error," i.e., the sort of error that warrants correction as a matter of the fairness of the proceedings below. *See Olano*, 507 U.S. at 737, 113 S.Ct. 1770 (instructing Courts of Appeals that Rule 52(b) requires reversal only if error "seriously affect[s] fairness, integrity or public reputation of judicial proceedings" (quoting *United States v. Atkinson*, 297 U.S. 157, 160, 56 S.Ct. 391, 80 L.Ed. 555 (1936))). The jury received adequate guidance on the point from testimony at trial from a U.S. Customs investigator:

> Q: Can you explain to the members of the jury the difference between international waters and Custom's territories?
>
> A: Custom's waters are those waters that are up to twelve miles from the coast of the U.S., including Puerto Rico. Anything beyond the twelve miles is considered international waters.
>
> Q: So anything within twelve miles from the coast of Puerto Rico would be considered United States waters, is that correct?
>
> A: Yes, ma'am, Customs' waters.

The same investigator, who was at the arrest scene, testified that he tracked Appellants' boat as it made its way to within three miles of the Puerto Rico coast.

This testimony indicated to the jury that, in order to convict Appellants of importing contraband into the United States, it had to find that Appellants brought the contraband within twelve miles of Puerto Rico. It also provided evidence that Appellants had imported contraband into waters well within the twelve-mile limit. Taken together, these pieces of testimony show that the jury was adequately advised of the relevant legal standard relating to the importation element as well as being furnished credible evidence establishing the importation element. We have no reason to believe that the court's purported omission affected Appellants' substantial rights or denigrated judicial proceedings.

### 4. *Sentencing*

■ Appellants argue that the district court erred by not granting them a two-level downward adjustment for a minor role in the offense under U.S.S.G. § 3B1.2. Appellants' claim in this regard rests on their purported role as mere transporters of cocaine, less responsible than other, unnamed participants. However, as the district court noted, Appellants produced no evidence to show that their role was necessarily minor. All were aboard a boat transporting cocaine from Colombia to Puerto Rico. There is little evidence of their specific duties. A now-deceased individual served as captain, but that does not indicate that others on board had a less significant function relative to the criminal activities. Quite possibly, persons uninvolved in the operation of the boat had greater responsibilities for acquiring and distributing the drugs. Reviewing the district court's factual determinations for clear error, *see United States v. Brandon*, 17 F.3d 409, 460 (1st Cir.1994), we conclude that none

occurred in the district court's rejection of a role-in-the-offense reduction.

 Finally, Appellants suggest that the district court erred in failing to depart downward under U.S.S.G. § 5K2.0 based on a variety of personal hardships that, in Appellants' view, reduced their culpability for their crimes. However, this court will entertain an appeal from such a decision only if the district court erroneously believed it lacked the legal authority to depart downward. *See United States v. Romolo*, 937 F.2d 20, 22 (1st Cir.1991). As Appellants nowhere allege that the district court was under such a misapprehension, their challenge fails for want of appellate jurisdiction.

We have carefully considered Appellants' other arguments, and conclude that they are without merit.

*Affirmed.*