USCA1 Opinion

 

 United States Court of Appeals
 For the First Circuit

No. 96-1764

 UNITED STATES,

 Plaintiff-Appellee,

 v.

 JULIO CONEO-GUERRERO,

 Defendant-Appellant.

No. 96-1765

 UNITED STATES,

 Plaintiff-Appellee,

 v.

 JUAN JOSE ARANGO-HERRERA

 Defendant-Appellant.

 ___________________

No. 96-1766

 UNITED STATES,

 Plaintiff-Appellee,

 v.

 JESUS A. VILLA-CONTRERAS,

 Defendant-Appellant.

 ____________________

 APPEALS FROM THE UNITED STATES DISTRICT COURT

 DISTRICT OF PUERTO RICO

 [Hon. Jose Antonio Fuste, U.S. District Judge]
 

 Before

 Torruella, Chief Judge,
 
 Campbell, Senior Circuit Judge,
 
 and Selya, Circuit Judge.
 
 

 Zygmunt G. Slominski on brief for appellant Julio Coneo-
Guerrero.
 Carmen R. De Jesus on brief for appellant Juan Jose Arango-
Herrera.
 Jorge A. Toro-McCown on brief for appellant Jesus A. Villa-
Contreras.
 Jacabed Rodriguez Coss, Assistant United States Attorney, with
whom Guillermo Gil, United States Attorney, and Jose A. Quiles-
Espinosa, Assistant United States Attorney, were on brief for
appellee.

July 14, 1998

 
 

 CAMPBELL, Senior Circuit Judge. After a jury trial, the
district court convicted Julio Coneo-Guerrero, Juan Jose Arango-
Herrera, and Jesus A. Villa-Contreras of importing into the United
States and possessing with intent to distribute 543 kilograms of
cocaine. 21 U.S.C. 952(a), 841(a)(1). The three Defendants
appeal from their convictions and sentences, citing many purported
errors. We affirm. In so doing, we discuss only the most salient
points. We have, however, considered carefully all the arguments
Appellants raise.

 BACKGROUND
 In reviewing a judgment of conviction, we view the facts
in the light most favorable to the government. See United Statesv. Christopher, 142 F.3d 46, 48 (1st Cir. 1998). 
 On the night of June 27-28, 1995, U.S. Customs pilots
flying approximately fifteen miles from the southern coast of
Puerto Rico spotted a forty-foot boat traveling rapidly north
toward Puerto Rico with its lights out. Joined by other agents on
sea and in the air, the agents tracked the boat until it stopped at
an area within three miles of the coast of Puerto Rico known as
Cayo Cabuzazos. There, the agents used night vision goggles to
observe the boat's crew dumping objects overboard into the water.
 To improve the scene's visibility, the agents summoned a
helicopter equipped with a powerful "night sun" searchlight, which
they directed at the boat. Realizing that they had unwanted
company, the crew immediately sped away toward the south. After a
lengthy chase and with the help of a local marine police unit,
Customs agents apprehended the boat roughly thirteen or fourteen
miles from the coast of Puerto Rico. Agents boarded the ship and
arrested all four members of the crew: the three Appellants, plus
the boat's captain, who is now deceased.
 While aboard, the agents made several discoveries. 
First, they observed that the boat's dashboard lights were covered
with opaque tape, obscuring their glow from nighttime observation. 
Second, there were two hand-written notes on board. One contained
five sets of coordinates plotting a route from Colombia to Puerto
Rico. The other, written in Spanish, vaguely prescribed an
allocation: "399 for the office [oficina]"; "85 for Nando"; "85
for Lindo"; and "5 for the crew." A later search revealed a pair
of burlap sacks.
 The significance of the sacks became apparent after a
contemporaneous search of the Cayo Cabuzazos area, where Appellants
had earlier been observed dumping items from their boat. There,
agents found several burlap sacks floating in the water, along with
hundreds of packages containing a total of 543 kilograms of
cocaine. According to the trial testimony of a FBI expert, the
sacks found aboard Appellants' boat were of the same color, make,
composition, and construction as those found floating with the
cocaine. Moreover, a second FBI expert testified that both sets of
sacks contained traces of cocaine.
 Upon their arrest, Appellants each explained that they
had come to Puerto Rico to pick up money, although they could not
say when or from whom. However, government agents testified at
trial that neither Appellants nor their boat were carrying any
document that would permit them to make a legal entry into Puerto
Rico.
 A week after the arrest, a federal grand jury indicted
Appellants for aiding and abetting, 18 U.S.C. 2, two substantive
violations: possessing a controlled substance with intent to
distribute, 21 U.S.C. 841(a)(1), and importation of a controlled
substance, 21 U.S.C. 952(a). Upon learning that a single
attorney, Miguel R. Calderon, planned on representing all
Defendants, the magistrate held a Foster hearing. See United
States v. Foster, 469 F.2d 1 (1st Cir. 1972). The district court
[(Fuste, J.)] held a second Foster hearing on August 22, 1995,
about ten weeks before trial. 
 Calderon continued to represent all Defendants throughout
the trial. The jury returned a verdict of guilty as to all
Defendants on both counts on December 15, 1995. Prior to
sentencing and after a third Foster hearing, the district court
granted attorney Calderon's motion to withdraw from representing
Defendants and appointed each separate counsel for purposes of
sentencing and appeal. The district court sentenced each defendant
to 235 months' imprisonment. This appeal followed.

 DISCUSSION
1. Ineffective Assistance of Counsel
 Appellants argue that their convictions are procedurally
invalid owing to the district court's having allowed Calderon to
represent all of them at the trial. Because one defendant's
interests may be adverse to another's, representation of multiple
defendants by the same attorney may lead to serious conflicts and
violate the Sixth Amendment's guarantee of effective counsel. SeeWood v. Georgia, 450 U.S. 261, 271 (1981). On the other hand, the
Sixth Amendment right to choose one's own counsel includes the
right to choose as a lawyer the representative of a co-defendant. 
See Wheat v. United States, 486 U.S. 153, 159 (1988). Balancing
these two aspects of the right to counsel the right to conflict-
free representation and the right to select one's counsel 
requires that joint representation be permitted only if each
defendant knowingly and voluntarily assumes the risk of potential
conflicts.
 Accordingly, Federal Rule of Criminal Procedure 44(c)
provides that the district court must inquire into each instance of
joint representation of multiple defendants, and must advise each
defendant of his right to separate counsel. In Foster, this court
spelled out the proper procedure for apprising a defendant of his
constitutional rights:
 [I]t shall be the duty of the trial court, as
 early in the litigation as practicable, to
 comment on some of the risks confronted where
 defendants are jointly represented to insure
 that defendants are aware of such risks, and
 to inquire diligently whether they have
 discussed the risks with their attorney, and
 whether they understand that they may retain
 separate counsel, or if qualified, may have
 counsel appointed by the court and paid for by
 the government. For the time being, at least,
 we leave to the discretion to the trial court
 the exact time and form of the inquiry.
 
Foster, 469 F.2d at 5; see also Bucuvalas v. United States, 98 F.3d
652, 655 (1st Cir. 1996). Without an appropriate Foster hearing,
the burden of persuasion shifts to the government to demonstrate
the absence of any likelihood of prejudice from the conflict of
interest. See United States v. Hernandez-Lebron, 23 F.3d 600, 606
(1st Cir. 1994). However, if the record shows a satisfactory
Foster hearing, the appellant bears the burden of "establish[ing]
that an actual conflict of interest adversely affected his lawyer's
performance." Cuyler v. Sullivan, 446 U.S. 335, 350 (1980); see
also United States v. Mazzaferro, 865 F.2d 450, 454-55 (1st Cir.
1989). Appellants argue that none of the Foster hearings was
adequate, shifting the burden of demonstrating a lack of actual
conflict to the government. They contend that the court seriously
erred in addressing them jointly, rather than separately, and in
failing to discern precisely who had retained Calderon to serve as
their attorney.
 We disagree on both scores. First, our review of the
record indicates that the district court conducted satisfactory
Foster hearings. There were three such hearings in this case, two
prior to trial. The two pre-trial Foster hearings more than
sufficed to ensure that Defendant-Appellants' acquiescence in joint
representation comported with Rule 44(c).
 The first hearing was conducted by the Magistrate just
before the bail hearing. The Magistrate granted each of four
court-appointed attorneys' request to withdraw from representing
the four Defendants in light of Calderon's appearance. The
Magistrate instructed Defendants regarding their constitutional
right to adequate and independent representation, and that joint
representation was not necessarily proper. The Magistrate then
asked all the Defendants whether they understood the potential for
conflicts and the difficulty of avoiding such conflicts. The
Magistrate then described potential conflicts that could emerge
during the course of proceedings, noting that the Defendants' level
of culpability could vary; that one or more of the Defendants could
cooperate in exchange for leniency; that the evidence might prove
stronger against one Defendant compared to another both as to guilt
and as to sentencing. The Magistrate also noted that if any of the
Defendants wanted to testify at trial, it would place their shared
counsel in an untenable position. Following these warnings, the
Magistrate asked Defendants whether they desired representation by
Calderon; they answered in the affirmative. 
 Finally, the Magistrate warned the Defendants that if any
of them changed his mind after trial, it would be too late to
conduct a new trial. Following the hearing, each Defendant
executed an "Acknowledgment of Joint Representation Admonishment"
also signed by their attorney Calderon.
 A few months before trial, the district court judge
conducted a second Foster hearing. There, the court specifically
noted that it had to appoint each defendant separate counsel
"unless it appear[ed] that there [was] good cause to believe no
conflict of interest was likely to arise." The court also
enumerated myriad issues that potentially would give rise to a
conflict of interest, including the inability of counsel to conduct
independent investigations, the inability of counsel to enter into
independent plea negotiations, the inability of counsel to seek
immunity for one defendant to testify against another, the
inability of counsel to communicate information gained from one
client to another because of attorney-client privilege, the
inability to waive the right to jury trial for any single
defendant, the inability of counsel to represent individual
interests in jury selection or the introduction of evidence, the
inability of counsel to present evidence that is exculpatory for
one defendant if inculpatory for another; the inability of counsel
to argue in the alternative as to the level of culpability of each
defendant, the inability of counsel to negotiate after trial on
behalf of one defendant against another, and the inability of
counsel to argue the Defendants' relative blame at sentencing. 
Calderon told the court, in the presence of Defendant-Appellants,
that he had discussed the potential for conflict with each of them
several times.
 The court then inquired, ultimately with no clear answer,
as to who was paying counsel for the Defendants and where that
person's loyalties lay. The court then questioned each defendant
as to his competency and capacity to understand what was being
explained. Finally, after warning the Defendants that the
emergence of a conflict "down the line" would not "stop the case,"
the court permitted Calderon to continue representing all the
Defendants. From the time of the second Foster hearing in August,
1995, until after the trial and conviction in December, 1995,
neither a Defendant nor Calderon suggested that the joint
representation had led to a conflict of interest.
 Between the verdict and sentencing, each of the three
surviving Defendant-Appellants requested the assignment of new
counsel. The district court then conducted a third Foster hearing,
at which it ultimately granted the request for new counsel during
sentencing and appeal. At this hearing, the district court
questioned each of the Defendants about his choice of Calderon as
attorney. Arango-Herrera complained about Calderon's tactical
decisions during trial and his communication regarding the
potential conflict. Each of the other two Appellants said that he
was satisfied with Calderon's performance. Indeed, each said that
they sought new counsel because they no longer had adequate funds
to pay for Calderon's representation.
 Appellants now argue that these apparently thorough
procedures were inadequate. First, citing United States v.
Gilliam, 975 F.2d 1050, 1053 (4th Cir. 1992), and United States v.
Edwardo-Franco, 885 F.2d 1002 (2d Cir. 1989), they argue that the
district court should have engaged Defendants in a "narrative"
colloquy. Second, based on the Advisory Note to Rule 44(c), they
claim that the district court should have addressed each defendant
separately. Finally, they suggest that the district court erred in
failing to advise them of their right to seek the assistance of an
independent attorney in understanding the risks of joint
representation. See United States v. Romero, 780 F.2d 981, 985
(11th Cir. 1986). 
 We do not think that the district court erred by failing
to do more than we have traditionally held a Foster hearing
requires. While each of the procedures Appellants suggest might
serve the interests motivating a Foster hearing, their absence is
not error where, as here, the record shows that the district court
made a diligent inquiry in this case, multiple inquiries into
whether the risks of joint representation were clear. 
 In light of the adequacy of the Foster hearings,
Appellants bear the burden of showing that the joint representation
caused an actual conflict of interest. In this regard, Appellants
point to the fact that the district court never pinpointed exactly
who was paying Calderon to represent them; the source of those
funds still remains a mystery. However, Appellants have failed to
adduce any evidence of an actual conflict, though they hypothesize
a number of potential conflicts relating to "the inherent dangers
that arise when a criminal defendant is represented by a lawyer
hired and paid by a third party." Wood, 450 U.S. at 268-69. For
instance, they point out that a conflict could have arisen if one
of them had accepted the government's offer of a plea bargain. 
However, there is no credible suggestion that this or any other
potential conflict ever occurred. Indeed, the problem with
Calderon's representation appears not to have been disloyalty, but
rather his lack of success and his cost. At the third Fosterhearing, Arango told the district court that he did not become
dissatisfied with Calderon's performance until they lost the case;
the two other Appellants stated that they sought new counsel only
because they could no longer afford Calderon. Accordingly,
Appellants have failed to meet their burden of showing that an
actual conflict arose adversely affecting Calderon's performance. 
See Carey v. United States, 50 F.3d 1097, 1100 (1st Cir. 1995)
("[T]he defendant must demonstrate that the alleged conflict is
more than 'some attenuated hypothesis having little consequence to
the adequacy of representation.'" (quoting Brien v. United States,
695 F.2d 10, 15 (1st Cir. 1982))); Mazzaferro, 865 F.2d at 454. 
2. Jury Instruction Regarding Reasonable Doubt
 Appellants fault the district court for not giving an
unrequested jury instruction that reasonable doubt exists when upon
viewing the evidence a reasonable juror would "hesitate to act" in
finding the defendant guilty. Their theory is that the absence of
such an instruction inappropriately reduced the government's burden
of proof. We disagree.
 "Reasonable doubt instructions are erroneous when, taken
as a whole, they have a 'reasonable likelihood' of misleading the
jury to believe that it can convict on some lesser standard of
proof than that required under the reasonable doubt standard." 
United States v. Romero, 32 F.3d 641, 651 (1st Cir. 1994). The
trial court's instruction was in this regard quite clear:
 [r]emember that the defendants are presumed by
 law to be not guilty or innocent. The law
 does not require defendants to prove that they
 are not guilty or produce any evidence at all. 
 The government has the burden of proving their
 guilty beyond a reasonable doubt. And if the
 government fails to do so, you must acquit the
 defendants. 
 
 Later, the court defined reasonable doubt as "a real doubt based
upon reason and common sense after careful and impartial
consideration of all the evidence in the case." Nothing in these
passages, nor in any cited by Appellants, shifted the burden of
proof from the government. Much less was the instruction's
definition of "reasonable doubt" inadequate. We cannot find
Appellants' preferred instruction plain error, see United States v.
Olano, 507 U.S. 725, 737 (1993) (defining plain error standard),
particularly given the district court's "considerable latitude" in
charging the jury, see United States v. Cassiere, 4 F.3d 1006, 1022
(1st Cir. 1993).
3. Jury Instruction Regarding the Elements of Importation
 Next, Appellants criticize the court for failing to
instruct the jury that the offense of importation, 21 U.S.C. 
952(a), requires that the defendant have brought contraband within
the twelve-mile outer limit of the United States' customs
territory. See United States v. Alvarado, 982 F.2d 659, 662 (1st
Cir. 1992) (explaining scope of 21 U.S.C. 952(a)). Because
Appellants did not object nor raise this contention at trial, our
review is confined to plain error. See United States v. Sullivan,
85 F.3d 743, 748 (1st Cir. 1996).
 We have ruled that "[a] critical element of the offense
of importation is that a defendant imports or causes to be imported
a controlled substance into the customs territory of the United
States." Alvarado, 982 F.2d at 662. In explaining the U.S.'s
"customs territory," the district court here instructed the jury
that 
 [t]he term United States when used in the
 geographic sense that we are dealing with
 here, means all places and waters continental
 or insular subject to the jurisdiction of the
 United States. The territorial waters of
 Puerto Rico are territorial waters of the
 United States. 
 
 While the district court did not explain, as it might have, that
the territory of the United States extended only twelve miles from
the shores of Puerto Rico, in the present context its omission was
not "plain error," i.e., the sort of error that warrants correction
as a matter of the fairness of the proceedings below. See Olano,
509 U.S. at 137 (instructing Courts of Appeals that Rule 52(b)
requires reversal only if error "seriously affect[s] fairness,
integrity or public reputation of judicial proceedings" (quoting
United States v. Atkinson, 297 U.S. 157, 160 (1936))). The jury
received adequate guidance on the point from testimony at trial
from a U.S. Customs investigator:
 Q: Can you explain to the members of the
 jury the difference between international
 waters and Custom's territories?

 A: Custom's waters are those waters that are
 up to twelve miles from the coast of the U.S.,
 including Puerto Rico. Anything beyond the
 twelve miles is considered international
 waters.

 Q: So anything within twelve miles from the
 coast of Puerto Rico would be considered
 United States waters, is that correct?

 A: Yes, ma'am, Customs' waters.

The same investigator, who was at the arrest scene, testified that
he tracked Appellants' boat as it made its way to within three
miles of the Puerto Rico coast. 
 This testimony indicated to the jury that, in order to
convict Appellants of importing contraband into the United States,
it had to find that Appellants brought the contraband within twelve
miles of Puerto Rico. It also provided evidence that Appellants
had imported contraband into waters well within the twelve-mile
limit. Taken together, these pieces of testimony show that the
jury was adequately advised of the relevant legal standard relating
to the importation element as well as being furnished credible
evidence establishing the importation element. We have no reason
to believe that the court's purported omission affected Appellants'
substantial rights or denigrated judicial proceedings.
4. Sentencing 
 Appellants argue that the district court erred by not
granting them a two-level downward adjustment for a minor role in
the offense under U.S.S.G. 3B1.2. Appellants' claim in this
regard rests on their purported role as mere transporters of
cocaine, less responsible than other, unnamed participants. 
However, as the district court noted, Appellants produced no
evidence to show that their role was necessarily minor. All were
aboard a boat transporting cocaine from Colombia to Puerto Rico.
There is little evidence of their specific duties. A now-deceased
individual served as captain, but that does not indicate that
others on board had a less significant function relative to the
criminal activities. Quite possibly, persons uninvolved in the
operation of the boat had greater responsibilities for acquiring
and distributing the drugs. Reviewing the district court's factual
determinations for clear error, see United States v. Brandon, 17
F.3d 409, 460 (1st Cir. 1994), we conclude that none occurred in
the district court's rejection of a role-in-the-offense reduction. 
 Finally, Appellants suggest that the district court erred
in failing to depart downward under U.S.S.G. 5K2.0 based on a
variety of personal hardships that, in Appellants' view, reduced
their culpability for their crimes. However, this court will
entertain an appeal from such a decision only if the district court
erroneously believed it lacked the legal authority to depart
downward. See United States v. Romolo, 937 F.2d 20, 22 (1st Cir.
1991). As Appellants nowhere allege that the district court was
under such a misapprehension, their challenge fails for want of
appellate jurisdiction.
 We have carefully considered Appellants' other arguments,
and conclude that they are without merit. 
 Affirmed.