Filed 2/10/22  P. v. Kistler CA1/4

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIRST APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| THE PEOPLE,<br><br>          Plaintiff and Respondent,<br><br>v.<br><br>NICHOLAS I. KISTLER,<br><br>          Defendant and Appellant. | A160882<br><br>(Humboldt County<br>Super. Ct. No. CR1701479) |

Defendant Nicholas I. Kistler appeals his jury trial conviction for attempted murder, felony assault with a deadly weapon, and misdemeanor resisting arrest, as well as his subsequent sentencing. First, Kistler asserts his counsel at trial "had an actual conflict of interest that affected her representation," which entitles him to a new trial. Second, Kistler argues his attorney's closing argument concession of guilt for resisting arrest violated due process, requiring reversal. Last, Kistler asserts the trial court erred in sentencing him to "seven-years-to-life" for premeditated attempted murder rather than specifying life with the possibility of parole.

For the reasons explained below, we reject these claims and affirm the conviction and sentence.

1

## BACKGROUND

At approximately 5:00 p.m. on April 3, 2017, witness Sunrise MacDonald was sitting in a parked truck next to Arcata Plaza when she saw a man wearing a bandana approach a man later determined to be victim Thomas Holloway, pull a hammer from his waistband, and strike Holloway twice in the head. The assailant then ran away. MacDonald later identified Kistler as the assailant from a photo lineup.

Witness Jasmine Oakeshott was having a cigarette outside a Plaza bar when she saw a masked man hitting another with a hammer. She could not hear what was being said and was unable to identify Kistler as the attacker.

Ami Mour testified for the defense. Mour knew both Kistler and Holloway from growing up in the area. On the incident date, Mour had taken his two-year-old daughter to the Arcata Plaza to "burn off some steam." There he saw Holloway walking around the Plaza with a ball-peen hammer and drinking with a group of people. Around 4:30 p.m., Holloway left the group, was out of sight for less than 10 minutes, and returned with two gentlemen. Kistler was also in the Plaza crowd, five to seven feet from Holloway. After several minutes, Mour heard Holloway say, "You're not going anywhere," followed by something like, "Get him." Holloway stood up. "Mr. Kistler was pretty much—they were within arm's reach of each other at that point, and I saw Mr. Kistler pull the hammer out in one swing. I couldn't tell with—almost like a backhand. I couldn't see it strike too well. I

2

saw it like a backhand, and within less than a second of that he was leaving."

Responding police collected a black bandana from the reported flight path. At the hospital, they showed Holloway a bystander's photograph of the attacker running from the scene. Holloway responded, "That's the guy that hit me with the hammer."

Meanwhile, Officer Matthew O'Donovan and his K-9 tracked the assailant's flight path. When the dog alerted to a crawl space under a house, the officer announced his presence and ordered surrender three times. When there was no response, the officer released the dog, which barked, indicating a find. The officer announced three more times that the person should come out or get bitten. When there was still no response the officer signaled the dog, which dragged Kistler out from the crawl space. Once the dog released him, Kistler was cooperative. At trial, Kistler testified that while in the crawl space he heard indistinct shouting but was not aware the police were there until the dog bit him.

Kistler was charged with two felonies and one misdemeanor: (count 1) attempted murder (Pen. Code,[1] §§ 664, 187); (count 2) assault with force likely to cause great bodily injury (§ 245 subd. (a)(4)); and (count 3) resisting arrest (§ 148, subd. (a)(1)). The information alleged in counts 1 and 2 that he

_____

[1] Further statutory citations are to the Penal Code.

3

personally used a deadly weapon (§ 12022, subd. (b)(1)) and personally inflicted great bodily injury (§ 12022.7, subd. (a)).

The defense theory was that Kistler acted in self-defense. Kistler testified that Holloway had previously threatened him. That day on the Plaza, Kistler had been told that Holloway thought Kistler had stabbed his girlfriend. Kistler saw one of Holloway's companions hand Holloway "a small to medium black canister. It appeared to have like a red trigger mechanism on the top of it. [¶] . . . [¶] It looked like a can of mace or pepper spray." When Kistler saw Holloway "returning with his buddies," he was standing by the planter where Holloway had been with the hammer. Kistler saw the hammer and put it in his waistband. "I grabbed it just in case, you know, these guys were coming to do something—you know, in case things got out of control, in case I needed to defend myself." Kistler told the group he was going to leave. Holloway responded, "You're not going anywhere, mother fucker. . . . Let's get him." Kistler raised the bandana he had been wearing that day,

> to potentially protect myself, I guess, against getting pepper sprayed, and then I turned—I approached maybe with one step in his direction as he was jumping up from the planter and swung the hammer once, and it hit him in the top of the head. I believe I was taking more of a step back when I brought the hammer back up again and made another quick blow. At that point in time, I saw him starting to go down, I turned around and ran."

In closing argument, defense counsel Meagan O'Connell briefly addressed the misdemeanor resisting arrest charge:

While we are on the issue of flight, resisting arrest, resisting or delaying an officer. I asked Mr. Kistler on the stand, "Did you delay an officer?" "Yes." He knows he did. He knows it. He said on direct he heard the dog barking. Did he see the dog, probably not. You heard the officer testify that he was burrowed in, and that the officer couldn't really see him when the dog first went down. Look back at that testimony. There is no question that he delayed an officer. We are not fighting that. We are not arguing it. Mr. Kistler even testified to it.

A jury found Kistler guilty as to all counts and the enhancements to be true. The court sentenced him to a total term of "11 years to life as to Count One" (seven years to life for attempted murder, plus consecutive one- and three-year terms for the enhancements). It stayed an eight-year term for count 2 and its enhancements pursuant to section 654 and declined to impose additional time or a court fine for the misdemeanor count 3.

## DISCUSSION

### I.    *Conflict*

Meagan O'Connell was Kistler's trial attorney and also the supervising attorney in the Humboldt County Conflict Counsel's Office. At the start of the trial the district attorney informed court and counsel that his office was prosecuting witness Oakeshott and others for unrelated drug sales, a moral turpitude offense that could be used to impeach Oakeshott at trial. Another member of the Conflict Counsel's Office represented someone also charged with Oakeshott. In addition, O'Connell had previously appeared in court on behalf of defense witness Mour, although she did not represent him.

5

Kistler asserts O'Connell and her office's connection with these trial witnesses created conflicts of interest that violate his Sixth Amendment right to counsel. He further asserts the trial court's inquiry into any potential conflict was inadequate. We disagree.

A criminal defendant's Sixth Amendment right to the assistance of counsel includes "the correlative right to representation free from any conflict of interest that undermines counsel's loyalty to his or her client." (*People v. Doolin* (2009) 45 Cal.4th 390, 417 (*Doolin*).) "As a general proposition, such conflicts 'embrace all situations in which an attorney's loyalty to, or efforts on behalf of, a client are threatened by his responsibilities to another client or a third person or by his own interests.' " (*People v. Cox* (1991) 53 Cal.3d 618, 653, overruled on another point in *Doolin, supra,* 45 Cal.4th at p. 421, fn. 22, quoting *People v. Bonin* (1989) 47 Cal.3d 808, 835 (*Bonin*).) To establish a Sixth Amendment violation, appellant must demonstrate " 'a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different.' " (*Mickens v. Taylor* (2002) 535 U.S. 162, 166 (*Mickens*), quoting *Strickland v. Washington* (1984) 466 U.S. 668, 694; see *Doolin*, at p. 417.)

Conflicts can occur when an attorney representing a defendant in a criminal matter concurrently represents or previously represented another person who is a witness in the case. (*Leverson v. Superior Court* (1983) 34 Cal.3d 530, 538 [involving codefendant calling counsel's former client as a witness

6

against defendant].) A conflict exists if the attorney is forced to choose between providing effective representation to the client/defendant and protecting the confidences of the witness with whom the attorney also has or had an attorney-client relationship. (*Ibid.*) But, when a public defender's or conflict attorney's office formerly represented a prosecution witness, the entire office is not necessarily disqualified. Counsel must consider, for example, the length of time between the representation, the nature and notoriety of the witness's case, whether the attorney who represented the witness is still a member of the office, and the nature and extent of screening procedures of that office. (*Rhaburn v. Superior Court* (2006) 140 Cal.App.4th 1566, 1581 [declining to apply a "rigid rule of vicarious disqualification"].)

A trial court has a duty to inquire into the propriety of multiple defendant representation only when " 'the trial court knows or reasonably should know a particular conflict exists.' " (*Mickens*, *supra*, 535 U.S. at pp. 168–169 [quoting *Cuyler v. Sullivan* (1980) 446 U.S. 335, 347, and declining to require automatic reversal for a trial court's failure to inquire into the nature of a multiple defendant representation].) Although a trial court "is required to perform some inquiry once it knows or reasonably should know of a particular conflict of interest, the court may decline to pursue the matter if, in its view, the potential for conflict is too slight." (*People v. Cornwell* (2005) 37 Cal.4th 50, 75, overruled on another point in *Doolin, supra,*

7

45 Cal.4th at p. 421, fn. 22, citing *Bonin, supra,* 47 Cal.3d at p. 837).)

### A. *Oakeshott*

Here, Oakeshott was not O'Connell's client, nor was she a client of O'Connell's office; rather, Oakeshott was the codefendant of a client of O'Connell's office. Absent an appropriate waiver, that codefendant dynamic may have precluded O'Connell or her office from representing Oakeshott in the unrelated, then pending drug sales case. (See, e.g., *People v. Mroczko* (1983) 35 Cal.3d 86, 92, 115 ["[S]eparate and independent counsel should be appointed for jointly charged indigent defendants at the outset of criminal proceedings"], overruled on another point in *Doolin, supra,* 45 Cal.4th at p. 421, fn. 22; *People v. Owen* (1989) 210 Cal.App.3d 561, 566.) But that trial and potential codefendant representation is not before us. Even so, demonstrating her personal duty of inquiry, O'Connell informed the court of her intent to speak with Oakeshott's defense counsel to determine the possibility of any conflict:

> [If] it would be some sort of conflict if I were to essentially delve into this kind of crime of moral turpitude . . . . I definitely don't want to find myself somehow incriminating a client that I represent or that my office represents.
>
> I also have office staff working on a conflict check just to ensure that there aren't any additional clients of mine listed in the report that perhaps [counsel] is unaware of.

The record does not reveal that any other actual or potential conflicts arose. The trial court granted Oakeshott use immunity and authorized her impeachment with the moral

turpitude offense, but declined to "allow a deeper exploration of her guilt or innocence . . . ." The district attorney and O'Connell, with Oakeshott's separate defense attorney present, then entered into a stipulation regarding the trial inquiry into the unadjudicated charged offense.

Under these circumstances, the representation of Oakeshott's codefendant by O'Connell's office in an unrelated case is too attenuated to create a de facto conflict of interest.

### B. *Mour*

O'Connell's appearance in court on behalf of Mour presents an importantly different dynamic. Mour was not a prosecution witness called to evidence Kistler's guilt at trial. Rather, Kistler chose to call Mour to support his theory of self-defense after meeting him in custody and learning he had witnessed the incident. Even so, court and counsel explored the possibility of a conflict of interest and permissible trial examination related to bias. In that context, O'Connell repeatedly stated to the court and district attorney that she had never represented Mour, although she may have appeared in court with him one time.

Mour affirmed the lack of representation: "I have seen you around the court a lot, but you never represented me in any cases." Mour further testified that he "sort of" remembered one day O'Connell "filling in for an attorney on my case, but I don't remember what we did that day. I remember your face from being assigned for the day." Thus, according to both O'Connell and Mour, there is no basis to believe O'Connell obtained confidential information from Mour or that there was a

9

"substantial" attorney-client relationship giving rise to a presumption of a conflict. (See *Vangsness v. Superior Court* (1984) 159 Cal.App.3d 1087, 1090; *Global Van Lines, Inc. v. Superior Court* (1983) 144 Cal.App.3d 483, 489.) In short, O'Connell's single stand-in appearance did not create an attorney-client relationship precluding O'Connell's later representation of Kistler.

### C. The Trial Court's Inquiry

In support of his argument that the trial court's inquiry into the potential conflicts of interest was inadequate, Kistler relies on *Bonin*, *supra*, 47 Cal.3d at p. 836, citing *Wood v. Georgia* (1981) 450 U.S. 261, 272. He asks, at a minimum, that we return the matter to the trial court to determine if a conflict in fact existed. We decline to do so.

First, the facts of *Bonin* are notably distinguishable. There, the trial court denied a request for substituted representation based on the two-part conflict issues of (1) counsel's attorney-client relationship with a key prosecution witness expected to testify that he and the defendant killed the victim, and (2) a literary rights fee agreement entered into between the defendant and proposed counsel. (*Bonin*, *supra*, 47 Cal.3d at pp. 830–836.) But at the recall of trial 30 days later, after the Court of Appeal had summarily denied proposed defense counsel's writ challenging the conflict finding, and without further trial court inquiry into the known conflicts or any subsequent waiver, the trial court did substitute in counsel who then represented the defendant throughout the trial. *Bonin,* therefore, has no bearing

10

on the trial court's duty of inquiry under the very different circumstances presented here.

Second, in *Mickens* the Supreme Court specifically rejected the extension Kistler requests today. "Petitioner's proposed rule of automatic reversal when there existed a conflict that did not affect counsel's performance, but the trial judge failed to make the *Sullivan*-mandated inquiry, makes little policy sense." (*Mickens, supra,* 535 U.S. at p. 172.) "[W]e think 'an actual conflict of interest' meant precisely a conflict *that affected counsel's performance*—as opposed to a mere theoretical division of loyalties." (*Id.* at p. 171.)

Moreover, the California Supreme Court has clarified its adoption of "the standard set out in *Mickens*." (*Doolin, supra,* 45 Cal.4th at p. 421.) This standard requires both an actual conflict of interest and a demonstration of prejudice, "which requires a defendant to show counsel's deficient performance and a reasonable probability that but for counsel's deficiencies, the result of the proceeding would have been different." (*Ibid.*; *People v. Rundle* (2008) 43 Cal.4th 76, 169, overruled on another point in *Doolin,* at p. 421, fn. 22.)

As discussed above, Oakeshott's representation by an attorney in O'Connell's office in an unrelated case did not present an apparent conflict that demanded trial court inquiry. Yet the written motions and conflict-related on-record discussions demonstrate that the trial court did consider and inquire into the nature of the potential conflicts. The court started by asking counsel to "frame the issue" on the record. After the district

11

attorney explained the pending drug case that presented "an act of moral turpitude that the defense would be entitled to impeach her with," defense counsel opined that narration was "minimizing" the issue. O'Connell then offered greater detail, including her wish to speak with counsel for the codefendants in the drug case to "determine whether or not he believes it would be some sort of conflict if I were to essentially delve into this kind of crime of moral turpitude, essentially. I definitely don't want to find myself somehow incriminating a client that I represent or that my office represents." At the conclusion of subsequent consultations, the potential Oakeshott conflict was resolved; no further trial court inquiry was needed.

Turning to Mour, O'Connell's one-time stand-in appearance could have presented a presumed conflict if a "substantial" attorney-client relationship had been established. (*Vangsness v. Superior Court, supra,* 159 Cal.App.3d at p. 1090.) The trial court appropriately inquired into the nature of that appearance and was strongly informed O'Connell had never represented Mour. Mour testified consistently at trial, raising no issue requiring further inquiry. Taken in the trial context, when Mour was a defense witness called to corroborate and confirm Kistler's self-defense theory, the trial court's inquiry into the potential Mour conflict was sufficient.

### D. Prejudice

Last, even if there was a potential conflict or the trial court's inquiry was insufficient, there is still no prejudice that warrants reversal. While Kistler now argues O'Connell's

12

cross-examination of Oakeshott should have been more vigorous and included a deeper inquiry into her narcotics and criminal history, the scope of questioning was consistent with both the court's order and the defense theory of self-defense. Under both direct and cross-examination, Oakeshott readily acknowledged that she did not see anything that preceded the assault, nor was she able to identify Kistler as the assailant.[2] It is difficult to imagine how a more rigorous cross-examination would have spurred Oakeshott to change her testimony in such a way that would have led to a different verdict. There was no prejudice to Kistler.

Not surprising, when called as a defense witness, Mour also testified consistently with Kistler and his theory of the case. While O'Connell's one-time appearance with Mour led to a bias-related question, that single inquiry is unlikely to have had any impact on the verdict in view of the totality of the evidence presented. No prejudice requires reversal or rehearing on the conflict issue.

II.     *Concession*

Kistler next asserts that O'Connell conceded Kistler resisted arrest without his knowledge or consent. He contends that this concession

---

[2] "I didn't see anything before that because, like I said, I just walked outside. So I just saw the one person hitting the other person, and then he took off." "Like I literally walked out and just saw it, and then the guy ran. And then – it was really fast. It wasn't like on—it was very quick."

13

made during closing argument violated his due process rights and requires reversal. We disagree.

Defense counsel are responsible for tactical trial decisions such as " 'what arguments to pursue, what evidentiary objections to raise, and what agreements to conclude regarding the admission of evidence.' " *McCoy v. Louisiana* (2018) 548 U.S. ___, 138 S.Ct. 1500, 1508 (*McCoy*), quoting *Gonzalez v. United States* (2008) 553 U. S. 242, 248.) But certain decisions are reserved for the client—"notably, whether to plead guilty, waive the right to a jury trial, testify in one's own behalf, and forgo an appeal." (*McCoy,* at p. 1508, citing *Jones v. Barnes* (1983) 463 U.S. 745, 751.) It is "the defendant's prerogative, not counsel's, to decide on the objective of his defense: to admit guilt in the hope of gaining mercy at the sentencing stage, or to maintain his innocence, leaving it to the State to prove his guilt beyond a reasonable doubt." (*McCoy*, at p. 1505.)

However, a defendant must voice his position. "If a client declines to participate in his defense, then an attorney may permissibly guide the defense pursuant to the strategy she believes to be in the defendant's best interest." (*McCoy, supra,* 138 S.Ct. at p. 1509.) It is only when there are express statements of the client's will to maintain innocence that "counsel may not steer the ship the other way." (*Ibid.,* citing *Gonzalez v. United States, supra,* 553 U.S. at p. 254.) If counsel's concession strategy, "given the evidence bearing on the defendant's guilt, satisfies the *Strickland* standard, . . . no tenable claim of ineffective assistance would remain." (*Florida v. Nixon* (2004)

14

543 U.S. 175, 192 (*Nixon*) [refusing to require a defendant's express consent before a concession of guilt at trial].)[3]

The facts of the instant case are very different from the capital cases of *Nixon* and *McCoy*, which involved defense counsel conceding guilt as to the charged murders in an attempt to gain mercy in the penalty phases. Here, the "concession" involved counsel's comment in closing argument that Kistler was not contesting the least serious offense, the misdemeanor resisting arrest charge.

> While we are on the issue of flight, resisting arrest, resisting or delaying an officer. I asked Mr. Kistler on the stand, "Did you delay an officer?" "Yes." He knows he did. He knows it. He said on direct he heard the dog barking. Did he see the dog, probably not. You heard the officer testify that he was burrowed in, and that the officer couldn't really see him when the dog first went down. Look back at that testimony. There is no question that he delayed an officer. We are not fighting that. We are not arguing it.

Kistler concedes that "[t]he record here does not demonstrate that Kistler expressly objected to his counsel's concession," but asserts that any rule requiring a defendant to personally object violates due process, the right to a fair trial, and the right to assistance of counsel. He asks us to impose a new rule requiring that a defendant "be informed on the record, either by the court or his counsel, of the need to object and be given the

---

[3] An attorney has a duty to consult with the client regarding "important decisions," including questions of overarching defense strategy. (*Strickland v. Washington, supra,* 466 U.S. at p. 688.)

opportunity to lodge that objection before any concession takes place."

But the United States Supreme Court has already rejected these arguments in *Nixon* and *McCoy*. As long as counsel discusses key trial strategy with the client, in satisfaction of *Strickland*, a defendant must specifically object to that strategy, or there is no error. (*McCoy*, *supra*, 138 S.Ct. at pp. 1505–1506; *Nixon, supra,* 543 U. S. at pp. 178, 192.) This court declines to extend that rule to require a separate on-record admonition as well.

Accordingly, because the record presents neither evidence of O'Connell failing to satisfy the *Strickland* consultation requirement nor of Kistler voicing an objection to counsel's concession strategy, Kistler's claim fails. Moreover, although Kistler was ultimately found guilty of misdemeanor resisting arrest, he was not sentenced on that offense. Any potential error is therefore harmless.

### III.    *Sentencing*

Last, Kistler argues the trial court's pronounced sentence of "seven years-to-life" on Count 1 is not a valid sentence because, with exceptions not applicable here, section 664, subdivision (a) only allows a sentence of "life without the possibility of parole" for attempted murder. (§ 664, subd. (a).) Accordingly, he maintains, the trial court "had no authority to require appellant to serve a minimum of seven years."

It is true that section 664, subdivision (a) provides that "if the crime attempted is willful, deliberate, and premediated

16

murder, as defined in Section 189, the person guilty of that attempt shall be punished by imprisonment in the state prison for *life with the possibility of parole.*" (Italics added.) But section 3046 further requires:

> (a) An inmate imprisoned under a life sentence shall not be paroled until he or she has served the greater of the following:
>
> (1) A term of at least seven calendar years.
>
> (2) A term as established pursuant to any other law that establishes a minimum term or minimum period of confinement under a life sentence before eligibility for parole.

Kistler was not charged with "willful, deliberate, and premediated murder, as defined in section 189" (§ 189, subd. (a); thus, the stated sentence of "seven years-to-life" accurately reflects the interrelationship between sections 664, subdivision (a) and 3046. In addition, consistent with the guidance of the California Supreme Court, "[b]y including the minimum term of imprisonment in its sentence, a trial court gives guidance to the Board of Prison Terms regarding the appropriate minimum term to apply, and it informs victims attending the sentencing hearing of the minimum period the defendant will have to serve before becoming eligible for parole." (*People v. Jefferson* (1999) 21 Cal.4th 86, 101–102, fn. 3.)

Accordingly, there is no error in the stated count 1 sentence of "seven years-to-life"; resentencing is not required.

### DISPOSITION

The judgment is affirmed.

_____
Desautels, J.\*

WE CONCUR:


_____
Streeter, Acting P.J.


_____
Brown, J.


_A160882  People v. Kistler_

---

\* Judge of the Alameda County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

18